ROMANA INGANNAMORTE AND FRED INGANNAMORTE, HER HUSBAND, PLAINTIFFS-RESPONDENTS, v. KINGS SUPER MARKETS, INC., A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-APPELLANT.

Argued November 3, 1969—Decided January 19, 1970.

Mr. *Edward A. Zunz, Jr.,* argued the cause for appellant (*Messrs. Riker, Danzig, Scherer & Brown,* attorneys, Mr. *Theodore E. Maloof,* on the brief).

Mr. *Frank J. Glock* argued the cause for respondents (*Messrs. Ferrara and Glock,* attorneys).

The opinion of the court was delivered by

JACOBS, J. The Law Division directed that judgment for possession be entered in favor of the plaintiffs-landlords unless, within thirty days, the defendant-tenant resumes its supermarket operations at the leased premises. The defendant appealed and we certified while the matter was awaiting argument in the Appellate Division. *R.* 2:12.

The plaintiffs own a small shopping center in the Borough of Dumont. It consists of a supermarket, which occupies about one-third of the total floor space in the center, and eleven satellite retail stores including, *inter alia,* a drugstore, a beauty salon, a delicatessen, a bakery, a confectionery and stationery store, a hardware store, a dry goods store, a children's clothing store, and a laundromat. In 1957 the plaintiffs leased the supermarket, which was then being operated by Acme Food Markets, to Dumont Valley Fair, Inc. for a term of ten years commencing February 1, 1958 with a five year renewal option. For several years Valley Fair operated the supermarket under the terms of its lease which provided, in pertinent part, that the leased store was "to be used and occupied only for a supermarket for the sale of all kinds of food, groceries, vegetables and refreshments, expressly ex-

cluding the sale of drugs, cosmetics, hardware, stationery, dishes, and on the premises bakery." The lease prohibited the landlord from letting premises in the "shopping center to other stores to be used as a butcher shop, fruit or vegetable store or fish market" and, so far as appears, this prohibition was strictly observed. It also provided that the parking area shall be maintained by the landlord and "shall be used for the benefit of all the tenants of the shopping center," and apparently this was strictly observed.

Early in 1961 there were negotiations with regard to an assignment of the supermarket lease from Valley Fair to defendant Kings Super Markets. The landlord's consent was required and there were relevant conversations between representatives of the landlord and Kings. Testimony introduced in the Law Division indicated that Mr. Bildner, president and general manager of Kings, had made site inspections, was told about the need for a fully operative supermarket with an adequate complement of food products, and was also told about the adverse economic effects on the shopping center from Valley Fair's inadequacies. Bildner deposed that he knew the Ingannamortes "wanted a supermarket as the nucleus of that particular center," and that he was told "that the merchants in the center were complaining about the operation" and that "the operation had to be improved." The Law Division found, on ample evidence, that Bildner had indicated "that Kings would conduct the type of active operation desired if Kings took the assignment." On May 31, 1961 the lease was assigned by Valley Fair to Kings with the landlord's written consent and Kings duly commenced its operation.

Kings operated the supermarket without interruption until October 8, 1966. At that time it ceased operation, closed its doors, and removed its exterior signs from the leased premises. However, it did not remove its equipment and continued to pay the monthly rental. On several occasions the Ingannamortes discussed the reopening of the supermarket with Bildner. At one point he told them that Kings was still interested in the area and was arranging for a study as to

the feasibility of expansion. At another point, in April 1967, he told them that Kings was not interested in expanding but was "still contemplating the operation there." Finally, in July 1967, the Ingannamortes wrote to Kings notifying that its tenancy was being terminated because it had vacated and abandoned the premises and had neglected and refused "to occupy and conduct a supermarket business as set forth in said leasehold agreement. * * *"

The plaintiffs refused to accept a tender of the August rent and on August 31, 1967 they instituted an action for possession. In the meantime Kings had notified the plaintiffs that it was renewing the lease for an additional five years, commencing with the termination of the original ten year term on February 1, 1968. Kings continued to make monthly tenders of rent until a stipulation was entered into on December 29, 1967 dispensing with further tenders until the determination of the plaintiffs' action. After taking testimony and considering the various legal contentions advanced before him, Judge Dalton filed an opinion in which he found that the use and occupancy clause of the lease was both restrictive and mandatory and that Kings had violated it by ceasing to actively operate a supermarket at the leased premises. He also found that the landlord's notice of termination was technically defective but sensibly disposed of this subordinate issue in the following fashion:

> The court finds that the termination notice [dated July 1967] is defective since not in accord with paragraph No. 35 of the lease, which requires that before the landlord declares a default he must give thirty days' written notice to the tenant specifying the nature of the default in order to afford said tenant an opportunity to cure same.
>
> On representations of both counsel, the court has been informed that the plaintiff is, and has always been, willing to allow the defendant to continue on the premises provided they conduct an active supermarket operation thereon, but that the defendant is not now, nor will they be in the foreseeable future, able to make a decision as to the conduct of any future operation on the site in question. This being the case, it would be a useless as well as a time consuming gesture for the court to order that proper notice be given at this point in time.

In view of the above, the court directs that judgment for possession be entered in favor of the plaintiffs to take effect thirty days from the entry of this order unless the defendants resume a fully active supermarket operation within that period.

The defendant's primary contention in support of its appeal is that the use and occupancy clause of the lease should be construed as restrictive but not mandatory. It cites cases such as *McCormick v. Stephany,* 57 *N. J. Eq.* 257, 263 (*Ch.* 1898), *modified,* 61 *N. J. Eq.* 208 (*Ch.* 1900) where the closing of a saloon was held not to violate a provision that the premises would not be used for any other purpose than a saloon, *Hoffman v. Seidman,* 101 *N. J. L.* 106, 109 (*E. & A.* 1925) where a covenant not to use the premises for any other purpose than a dwelling and a hardware and paint store was said to impose "no obligation to use the premises at all," and *Burns & Schaffer Amusement Co. v. Conover,* 111 *N. J. L.* 257, 263 (*E. & A.* 1933) where a covenant to use the leased premises only for the moving picture or theatre business was held to prohibit uses other than moving picture or theatre purposes but not to "require operation for those authorized uses." But these cases and others like them, did not involve the precise use and occupancy language in the lease before us and, much more to the point, did not involve a situation where, as here, there were interdependent economic units and the landlord had an obvious interest in the continued active operation of the leased premises far beyond the mere payment of the fixed monthly rental.

In *Plassmeyer v. Brenta,* 24 *N. J. Super.* 322 (*App. Div.* 1953) there was a twenty-year lease of premises to "be used and occupied only and for no other purpose than as a gasoline service station." The rent was fixed at a stipulated amount per month and as "additional rent" the lessee agreed to pay one cent for each gallon of gasoline delivered into the storage tanks on the premises in excess of a certain gallonage. The premises were never used as a gasoline service station and it was contended that so long as the tenant paid the monthly rent and did not engage in any other occupa-

tion on the premises, no breach of the lease arose. This contention was rejected by both the trial court and the Appellate Division. In the course of the latter's opinion the following appears:

> The trial court concluded that the language of the lease was clear and unambiguous and plainly created a duty to operate a gasoline service station. Our study of the instrument convinces us that this interpretation was correct. The language employed, particularly that dealing with the rental obligation, was prohibitive and mandatory with respect to use, and not merely restrictive, as in the cases on which appellant relies, namely, *Burns & Schaffer Amusement Co. v. Conover*, 111 *N. J. L.* 257 (*E. & A.* 1933) ; *Hoffman v. Seidman*, 101 *N. J. L.* 106 (*E. & A.* 1925) ; *McCormick v. Stephany*, 57 *N. J. Eq.* 257 (Ch. 1898). Consequently failure to engage in that use constituted a breach.

24 *N. J. Super.* at 325.

*Plassmeyer* viewed its lease as embodying an express mandate for continued operation whereas other cases have found implied mandates in comparable leases. Thus in *Silverstein v. Keane,* 19 *N. J.* 1 (1955), this Court referred to the many decisions which have implied mandatory operation requirements in percentage leases, and it pointed out that "[t]he implication of an obligation from the terms of the agreement considering what was written in the light of the attendant circumstances and conditions is a settled principle in New Jersey law." 19 *N. J.* at 12. It matters not whether the court speaks of the mandate as implied or expressed for the ascertained intention of the parties is the same under either approach as is the judicial determination. Nor does it matter that the lease is not a percentage lease where there are other circumstances sufficiently evidencing the intention of the parties that the lessee will be under a mandate to operate reasonably within the terms of the lease. *See Lilac Variety, Inc. v. Dallas Texas Company,* 383 *S. W. 2d* 193 (*Tex. Civ. App.* 1964) ; *Amos v. Cummings,* 67 *A. 2d* 687 (*D. C. Mun. Ct. App.* 1949) ; *Asling v. McAllister-Fitzgerald Lumber Co.,* 120 *Kan.* 455, 244 *P.* 16, 46 *A. L. R.* 1127 (1926) ; *cf. Fox v. Fox Valley Trotting Club,* 8 *Ill. 2d* 571, 134 *N. E. 2d* 806,

810 (1956) ; *Automatic Laundry Service v. Demas,* 216 *Md.* 544, 141 *A.* 2*d* 497, 501 (1958).

In *Lilac Variety, supra,* the owner of a suburban shopping center leased a retail store for fifteen years to T G & Y Stores and shortly thereafter leased the center's supermarket, as planned and as set forth in a provision of T G Y's lease, to the A. C. F. Wrigley Stores. The supermarket was operated for a while and was then closed with Wrigley continuing to pay rent. T G & Y Stores then sought and obtained a judgment entitling it to cancel its lease because of the closing of the supermarket. The court found sufficient implication of a requirement that the supermarket would continue operation; in the course of its opinion it said:

> We think it is common knowledge that the volume of pedestrian traffic at the site of a retail merchandising business is a factor which affects the gross sales potential of the business. That being so the purpose and the importance to appellants of the lease provisions with reference to a supermarket are obvious. Plainly the parties intended that a supermarket should be in operation during the term of the lease. We find it impossible to believe that when the parties entered into this lease agreement it was intended that the particular lease provision in question would be satisfied if A. C. F. Wrigley Stores should continue to pay rent on an idle store building after discontinuing operation of the supermarket.

383 *S. W.* 2*d* at 196.

The lease between the plaintiffs and Valley Fair contained enough on its face to imply an operating mandate as against its original lessee Valley Fair; and any doubt insofar as the assignee Kings was concerned was removed by the testimony and findings with respect to the negotiations between the Ingannamortes and Bildner at the time of the assignment. The lease itself disclosed that it was for a supermarket in the landlord's shopping center at Dumont; it provided that the premises were to be "used and occupied" only for a supermarket excluding, however, certain items which obviously were being sold in other stores in the center; these other stores were expressly to be prohibited from competing with the supermarket in its sale of meats, fish, fruits and

vegetables; and the landlord was to maintain the common parking area for the entire center including the supermarket and the other stores. When these lease provisions are viewed in the light of the physical and geographic circumstances there would appear to remain little reason to question that the parties contemplated that the supermarket would continue to be operated as such and that mere payment of rent for an "idle store building" (*Lilac Variety, supra*) would not satisfy the purposes of the center or the landlord's execution of the lease.

The defendant asserts that the testimony as to the negotiations at the time of the assignment was inadmissible but we disagree. It clearly evidenced the intention of Kings and the Ingannamortes, when they entered into their acceptance and approval of the assignment, as well as their practical construction of the terms of the assigned lease. In recent years our courts have broadly admitted comparable evidence of intent and practical construction which fairly served to clarify the goals of the parties and the meaning of their language. *See Casriel v. King*, 2 *N. J.* 45, 50–51 (1949); *Atlantic Northern Airlines, Inc. v. Schwimmer*, 12 *N. J.* 293, 301–02 (1953); *Garden State Plaza Corp. v. S. S. Kresge Co.*, 78 *N. J. Super.* 485, 496 (*App. Div.*), certif. denied, 40 *N. J.* 226 (1963); cf. *Fidelity Union Trust Co. v. Robert*, 36 *N. J.* 561, 567 (1962); *In re Cook*, 44 *N. J.* 1, 6 (1965).

In the light of all of the above, the judgment entered below may properly be affirmed without any need for dealing with any of the collateral issues. Thus there is no occasion for considering whether the Ingannamortes would have the legal right to compel Kings to resume operations and, if so, under what terms. *Cf. Dover Shopping Center, Inc. v. Cushman's Sons, Inc.*, 63 *N. J. Super.* 384 (*App. Div.* 1960); *Lilac Variety, Inc. v. Dallas Texas Company, supra*, 383 *S. W.* 2d 193; 2 *Powell, Real Property*, sec. 242[2][b] at 372.26 (1967). At oral argument, counsel for the Ingannamortes stated that the only thing they seek beyond the payment of rent due to date, which Kings acknowledges, is to have Kings

either vacate the premises completely with cancellation of the lease, or to have it resume operation of the supermarket in reasonable fashion. Surely the terms of the lease and every consideration of fairness entitle them to that measure of relief. Kings still has the aforementioned option which it may exercise within thirty days from the filing of this opinion, and clearly it is in no just position to claim more.

Affirmed.

*For affimance*—Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—6.

*For reversal*—None.