**In re OKLAHOMA PLAZA INVESTORS, LTD.,**
**Debtor.**

**OKLAHOMA PLAZA INVESTORS, LTD., Plaintiff,**

**v.**

**WAL–MART STORES, INC., Defendant.**

**Bankruptcy No. 89–01236–C.**
**Adv. No. 90–0151–C.**

United States Bankruptcy Court,
N.D. Oklahoma.

Feb. 21, 1991.

---

Natalie Shirley, Oklahoma City, Okl., for plaintiff.

Jon B. Comstock, Tulsa, Okl., for defendant.

## MEMORANDUM OPINION

STEPHEN J. COVEY, Bankruptcy Judge.

There are two principle issues to be decided.

1. Whether or not Oklahoma Plaza Investors, Ltd. ("OPI" or the "Debtor") has rejected its unexpired lease ("Lease") with Wal–Mart Stores, Inc. ("Wal–Mart") pursuant to Section 365 of the Bankruptcy Code or the provisions of the Debtor's confirmed plan.

2. Whether or not under the uncontested facts, Wal–Mart has breached the Lease as a matter of law.

This matter comes before the Court in two different ways. First the Debtor has filed a Motion for Order in Aid of Implementation of Plan asking the Court to find the Lease has not been rejected and order Wal–Mart to continue making its base rent payments. Secondly, the Debtor has filed an adversary proceeding seeking damages from Wal–Mart for breach of the Lease and Wal–Mart has filed an affirmative defense alleging that the Lease has been rejected by the Debtor. Also, in the adversary proceeding, both parties have filed motions for partial summary judgment on these issues of rejection and breach of contract.

This Court has jurisdiction to hear these issues under Title 28, § 1334 of the U.S. Code. This is a core proceeding pursuant to Title 28, § 157 of the U.S.Code and § 1142 of the Bankruptcy Code.

## STATEMENT OF FACT

On May 6, 1977, Stephen M. King, as agent for L.R. Latch, signed the Lease in question as lessor and James L. Walton signed on behalf of Wal–Mart. The Lease rented space to Wal–Mart in the Rolling Hills Shopping Center located in Catoosa, Oklahoma. The shopping center consists of three separate buildings. The first two were built in 1963 and the Wal–Mart building was constructed in 1977. The Lease in question was executed prior to the construction of the Wal–Mart building and the construction was financed by Sooner Federal Savings and Loan.

The material provisions of the Lease are as follows.

1. The Lease is to run for twenty (20) years from November 8, 1977, to November 7, 1997.

2. The Lease covered 29,700 feet which is approximately forty percent (40%) of the space in the three buildings.

3. The base rent is $4,950.00 a month, plus a provision for a percentage rent of one percent (1%) of gross sales over and above the base rent.

4. The lessee had the right to sublet the premises or assign the Lease, however, no such subletting or assigning would relieve the lessee of any of its obligations under the Lease (Paragraph 17 of Lease).

5. Lessee had the right at any time to remove any fixtures, goods or equipment installed by it on the premises (Paragraph 22 of Lease).

6. A *Use of Premises* clause states as follows:

A. It is understood and agreed that the demised premises being leased will be used by the Lessee in the operation of a discount store, but Lessor agrees the store may be used for any lawful purpose other than the operation of a supermarket (however Lessee shall be permitted to sell or offer for sale food items which are customarily sold or offered for sale in supermarkets provided that the area for said items shall not exceed ten (10) percent of the total store square footage).

7. Paragraph 16 of the Lease entitled *"Default Clause"* provides as follows:

A. *If the demised premises shall be deserted for a period of over 30 days*, or if Lessee shall be adjudicated a bankrupt, or if a trustee or receiver of Lessee's property be appointed, or if Lessee shall make an assignment for the benefit of creditors, *or if default shall at any time be made by Lessee in the payment of the rent reserved herein, or any installment thereof for more than ten (10) days after written notice of such default by the Lessor*, or if there shall be default in the performance of any other covenant, agreement, condition, rule or regulation herein contained or hereafter established on the part of the Lessee for thirty (30) days after written notice of such default by the Lessor, this lease, if the Lessor or elects, shall thereupon become null and void, and the Lessor shall have the right to reenter or repossess the leased property, either by force, summary proceedings, surrender or otherwise, and dispossess and remove therefrom the Lessee or other occupants thereof and their effects, without being liable to any prosecution therefor. In such case, the Lessor may, at its option, relet the demised premises or any part thereof, as the agent of the Lessee, and the Lessee shall pay the Lessor the amount by which the rent and charges equivalent to rent reserved herein for the balance of the term shall exceed the reasonable rental value of the demised premises for the same period. *Lessee agrees, irrespective of other provisions of this lease, that in the event any monthly installment of rent is not paid by the 10th of the month, additional rent of ten percent (10%) of the monthly rental shall be paid for such month.*[1] (Emphasis added)

In 1984 the Debtor purchased the shopping center and received an assignment of the Wal–Mart Lease.

On November 30, 1988, the Debtor filed for relief under Chapter 11 of the Bankruptcy Code in the Central District of California. At that time its principle business consisted of owning, operating, and leasing space in three shopping centers in Oklahoma including Rolling Hills.

Post-petition, on or about January 1, 1989, Wal–Mart removed its inventory and fixtures from the leased premises, locked the doors, covered up the windows with brown paper, and ceased operating its discount store in the Rolling Hills Shopping Center. Subsequent to its cessation of its operations, Wal–Mart did use the premises for storage and as a meeting facility and continued to make the base rent payments until July 11, 1990, when it contends the Lease was rejected by the Debtor. There is no indication in any of the affidavits as to the extent the leased premises were used for meetings and storage.

On May 4, 1989, the case was transferred to the Northern District of Oklahoma. On May 11, 1990, the Debtor's Third Amended Disclosure Statement was approved and the Second Amended Plan confirmed.

The principle idea, purpose, and concept of the confirmed plan is that the Debtor is to pay its debts out of the rents collected from the tenants in the three shopping centers and from the proceeds of litigation against Wal–Mart. The material provisions of the Plan are as follows.

7.1 *Acceptance of Executory Contracts.* All known executory contracts which are to be accepted, are identified on the Exhibit referenced in the Disclosure Statement. All other executory contracts are hereby automatically rejected thirty (30) days after the Confirmation of the Plan.

### 5.0 IMPLEMENTATION AND EXECUTION OF THE PLAN.

5.1 *The Pool of Funds Explained.* The funds necessary for the implementation of the Plan Claims shall be generated from three sources of funds, to-wit:

5.1(a) *Pool 1.* The revenues generated from the tenants at each of the three shop-

---

**1.** These two provisions, and particularly the underlined portions, form the basis of the Court's opinion.

ping centers owned by the Reorganized OPI Limited Partnership less budgeted expenses which shall be approved as part of the Plan. (See Schedule "4" in the Disclosure Statement.) [2]

5.1(b) *Pool 2.* The revenues generated by the lawsuits initiated against Wal–Mart in connection with their vacation and abandonment of leases at Shawnee Plaza and Rolling Hills.

5.1(c) *Pool 3.* ... The Reorganized OPI Limited Partnership will use the pools of revenues of the Estate to enable it to continue its normal course of business and operations so as to generate the funds necessary to effectuate the terms of this Plan. The sources of revenues will be used according to Schedule "1.0" set out in the Disclosure Statement.

On May 29, 1990, the Debtor filed a three count Complaint against Wal–Mart. Count One was for a breach of the express provisions of the Lease, Count Two was for a breach of an implied covenant of continuous operations, and Count Three was for tortious breach of contract. On the motion of Wal–Mart, the Court has dismissed Count Two but has denied the motion to dismiss Counts One and Three.

On November 21, 1990, the Debtor filed a Motion for Partial Summary Judgment asking that this Court determine, as a matter of law based on the uncontested facts, that Wal–Mart has breached the express terms of the Lease and is, therefore, liable for damages under Count One of the Complaint. Wal–Mart in turn on January 14, 1991, filed a Cross Motion for Partial Summary Judgment asking that this Court determine, as a matter of law, from the uncontested facts, that Wal–Mart has not breached the express terms of the Lease. Additionally, in Wal–Mart's motion, they asked that this Court determine, as a matter of law under the uncontested facts, that the Debtor has rejected the Lease pursuant to § 365 of the Bankruptcy Code or the terms of the confirmed Plan by failing to expressly assume it. Additionally, Wal–Mart contends the lease is null and void pursuant to Paragraph 14 of the Lease

which provides that the lease may be voided by the lessee in event of the bankruptcy of the lessor (ipso facto clause).

On December 5, 1990, the Debtor filed an Amended Motion for Order in Aid of Implementation of Plan. In this motion, the Debtor prays for an order directing Wal–Mart to pay the rents provided for under the Lease and pursuant to the Plan. Inherent in this motion is the contention that the Lease has not been rejected by the Debtor.

## CONCLUSIONS OF LAW

The first issue to be decided is whether the Debtor has rejected the Lease with Wal–Mart pursuant to § 365 of the Bankruptcy Code or the terms of the Plan. If the Lease has been rejected, then the Debtor's adversary Complaint asking for damages for breach of the lease is moot and should be dismissed.

Section 365 of the Bankruptcy Code deals with the assumption or rejection of executory contracts and unexpired leases. The material portions of said section are as follows:

Section 365. *Executory contracts and unexpired leases.*

(a) ... the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

(d)(1) In a case under chapter 7 of this title, if the trustee does not assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor within 60 days after the order for relief ...

(2) In a case under chapter 9, 11, 12, or 13 of this title, the trustee may assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor at any time before the confirmation of a plan ...

(4) Notwithstanding paragraphs (1) and (2), in a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of

**2.** This schedule shows the annual gross rentals from Rolling Hills to be $185,000.00.

nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.[3]

Section 365(a) merely states that a trustee *may* assume or reject an unexpired lease. There is no duty upon a trustee to assume an unexpired lease or have it deemed rejected in § 365 except Subparagraphs (d)(1) and (d)(4). In (d)(1) a trustee in a chapter 7 case is deemed to have rejected an unexpired lease of *residential* real property if he does not accept it within sixty (60) days from the order for relief. Under (d)(4) a debtor/lessee of *non-residential* real property (commercial property) must accept the lease within sixty (60) days or have it deemed rejected. It should also be noted that under (d)(2) in a Chapter 11 case in regard to *residential* real property, the trustee has no duty to assume or reject a lease unless ordered to do so by the court.

■ Section 365 contains detailed provisions as to when a lease is deemed rejected if not assumed. There is no provision in § 365 which requires a *debtor/lessor* to assume a non-residential (commercial) lease of real estate or have it deemed rejected. This Court will hold, therefore, that under § 365 of the Bankruptcy Code, the Debtor has no duty to assume the unexpired lease with Wal–Mart or have it deemed rejected. There is no such requirement in the Bankruptcy Code and this Court will not write one into it. The reason a debtor/lessor does not have to assume a lease in a Chapter 11 proceeding is that under § 1108 of the Bankruptcy Code a trustee or debtor-in-possession is authorized to operate the business of the debtor without order of court. In the present case, the business of the Debtor is to lease property and collect rents. The Debtor may do this without Court authorization and there is no requirement that the Debtor obtain an order of

Court authorizing it to assume all of its leases in the three shopping centers.

The issue is discussed in COLLIER on Bankruptcy Vol. 3, ¶ 365.09 as follows:

¶ 365.09 **Debtor as Lessor of Real Property; § 365(h)**

Problems concerning the rejection of unexpired leases of real property where the debtor is the lessor rather than the lessee are infrequently litigated, due no doubt to the fact that the bankruptcy or reorganization of a lessor will not ordinarily disturb existing leases, since the lessor's interest and the rents accruing thereon will be administered as definite assets of the estate.

■ The next issue to be decided is whether the Plan imposed upon the Debtor a duty to accept unexpired leases or have them deemed rejected. All parties agree that the Debtor has not expressly assumed the unexpired leases pursuant to Court order. Under Paragraph 7.1 of the Plan, all executory contracts were automatically rejected thirty (30) days after the confirmation of the Plan unless identified on an exhibit attached to the Disclosure Statement. In the present case, the unexpired lease with Wal–Mart was not so identified and Wal–Mart claims this amounts to a rejection of said lease.

The Court will reject this contention of Wal–Mart for several reasons. First, under § 365 of the Bankruptcy Code, executory contracts and unexpired leases are treated as separate and distinct concepts or ideas. Throughout this section, the Code refers to executory contracts *and* unexpired leases. It does not refer to executory contracts *including* unexpired leases. Throughout § 365, there are provisions that relate separately to executory contracts or unexpired leases. This Court holds that within a bankruptcy context executory contracts and unexpired leases are not the same thing and that when the Debtor used the term "executory contracts" in its Plan, it did not intend or mean to include "unexpired leases". Therefore, the

---

**3.** The term "Trustee" as used in § 365 includes a     debtor-in-possession.

duty imposed on the Debtor under 7.1 of the Plan, to identify executory contracts or have them automatically rejected, does not apply to unexpired leases.

■ Additionally, if the term executory contracts can be construed to include unexpired leases, then this Court holds that the Debtor has assumed the lease in its confirmed Plan even though the term "assumption" is never used. Under 5.1(a), 5.1(b), and 5.1(c) of the Plan, it is clear that the whole purpose and intent of the Plan is to pay the creditors out of future rents and the proceeds of litigation with Wal–Mart. Additionally, the Wal–Mart Lease on the Rolling Hills Shopping Center was specifically listed on the appropriate exhibit to the Disclosure Statement as being one of the leases from which revenue was to be generated to fund the Plan ($185,000.00 per year). It is clear to this Court that the entire concept of the Plan is for the Debtor to assume the unexpired leases. It is obvious from the Plan that the Debtor had no intention to reject unexpired leases by failing to expressly accept them.

■ Finally, the Lease cannot be voided by the lessee because of the bankruptcy of the lessor. Section 365(e)(1) of the Bankruptcy Code expressly nullifies and voids all such ipso facto clauses.

In conclusion, therefore, this Court holds that the Debtor has not rejected the unexpired leases with Wal–Mart either under the provisions of § 365 of the Bankruptcy Code or the provisions of the confirmed Plan. The Court will, therefore, in a separate order, grant the Debtor's Motion for Order in Aid of Implementation of the Plan and order Wal–Mart to pay to the Debtor the base rent provided for under the Lease of $4,950.00 per month, plus a ten percent (10%) penalty on all past-due accounts. The Court will also order that the Lease cannot be voided because of the ipso facto clause.

Since the Debtor has not rejected the unexpired lease with Wal–Mart, the next issue before the Court is whether the Court should grant either the Debtor's or Wal–Mart's Motion for Partial Summary Judgment.

The Debtor contends that Wal–Mart defaulted under the Lease when it ceased operating a discount store on the demised premises, removed its inventory and equipment, locked the doors, and covered up the windows with brown paper. Wal–Mart contends that it is under no duty to continuously operate a discount store on the premises and that its only obligation is to pay the monthly base rent of $4,950.00. It further contends that if it is under a duty to use the premises, it is fulfilling that duty by occasionally using the premises for a meeting place and storage facility. Both parties argue that the Lease is unambiguous and should be construed by looking within the four corners of the Lease. Even though both parties agree that the lease is unambiguous, strangely enough they come to different conclusions as to what the unambiguous lease means.

The Oklahoma Supreme Court in the case of *Mercury Inv. Co. v. F.W. Woolworth Co.*, 706 P.2d 523 (Okl.1985) laid down certain basic rules that are to be applied in construing a lease as follows:

A contract must be considered as a whole so as to give effect to all its provisions without narrowly concentrating upon some clause or language taken out of context. The language in a contract is given its plain and ordinary meaning unless some technical term is used in a manner meant to convey a specific technical concept. The court must interpret a contract so as to give effect to the intent of the parties at the time the contract was formed. The parol evidence rule provides that unless fraud or mistake is involved pre-contract negotiations and oral discussions are merged into, and superseded by, the terms of the executed written agreement. While parol testimony cannot vary, modify or contradict the terms of the instrument, it is admissible to explain the meaning of words when there is a latent ambiguity in the written text of the agreement. Thus the practical construction of an agreement, as evidenced by the acts and conduct of the parties, is available only in the event of an ambiguity. *But where a contract is*

*complete in itself and, as viewed in its entirety, is unambiguous, its language is the only legitimate evidence of what the parties intended.* The intention of the parties cannot be determined from the surrounding circumstances, but must be gathered from a four-corners' examination of the contractual instrument in question. (n. omitted.)

This Court finds that the lease is unambiguous and that its language is the only legitimate evidence of what the parties intended. The Court rules that the intention of the parties cannot be determined from the surrounding circumstances but must be gathered from a four-corners examination of the document.

The Debtor relies primarily upon the *Use of Premises* clause and the *Default Clause.* Under the Use of Premises clause, Wal–Mart agreed that the premises will be used for a discount store but that the *store* could be used for any lawful purpose. The default clause describes various acts of the lessee that will be considered a default. One of these acts is desertion of the premises. The Debtor contends that under the uncontested facts, Wal–Mart has, as a matter of law, deserted the premises and, therefore, breached the Lease.

Wal–Mart, on the other hand, contends that the *Use of Premises* clause is not *mandatory but restrictive.* By this it means the clause does not require it to operate a discount store on the premises for the term of the Lease but merely restricts its use to the operation of a discount store if it is used at all. Wal–Mart argues that its right to assign the Lease and remove its fixtures clearly indicates that they are under no obligation to operate a discount store on the premises but may use the store for any lawful use including occasional meetings and storage. Wal–Mart also argues that desertion of the premises requires not only a cessation of operations of a discount store but also a failure to pay the base rent. They argue they did pay the base rent until, the Debtor rejected the Lease, therefore, there has been no desertion of the premises.

This Court agrees with the Debtor's construction of this unambiguous lease. The *Default Clause* of the Lease is clear, plain, simple and unambiguous and says that if lessee deserts the premises the Lease is in default. The undisputed facts shows that Wal–Mart has ceased operating a discount store on the premises, removed its inventory and fixtures, locked the door, and covered the windows with brown paper. This is a desertion of the premises and a breach of the Lease. Wal–Mart promised and agreed to operate a discount store on the premises and further agreed that a desertion of the premises would be a default. Wal–Mart should be required to keep its promises. A savings and loan advanced money to construct the premises and the Debtor purchased the shopping center after Wal–Mart had entered into its lease. Additionally, Wal–Mart is the major or anchor tenant in the shopping center and all other tenants depend upon it to create customer traffic. Wal–Mart should not be allowed to break its promise to operate a discount store on the premises or to ignore its agreement that desertion of the premises would be a default.

Issues similar to the present case have been discussed and decided by many courts. In *Slater v. Pearle Vision Center, Inc.,* 376 Pa.Super. 580, 546 A.2d 676 (1988), a strip shopping mall landlord filed a complaint in equity seeking an injunction to require a tenant, Pearle Vision Center, Inc., to occupy and use the premises. Although Pearle had paid the rent under the lease, it had never occupied the leased premises. The shopping center was concerned that the presence of a vacant store would damage the business of the shopping mall and, therefore, sought injunctive relief. The Lease provided that the tenant shall use the premises solely as a Pearle Vision Center for the retail sale and repair of eyeglasses and for no other purpose. The lease also provided that *abandonment* was an event of default. The court in ruling that Pearle Vision had breached the lease even though it was making the required monthly payments stated as follows:

But these cases and others like them, did not involve the precise use and occupancy language in the lease before us and, much more to the point, did not involve a situation where, as here, there were interdependent economic units and the landlord had an obvious interest in the continued active operation of the leased premises far beyond the mere payment of the fixed monthly rental ... In the instant case, the lease is not completely silent on the tenant's duty to occupy. If it were, we would conclude that the tenant had no duty to occupy because the landlord failed to include such a condition in the lease. Here, several provisions on the lease can arguably lead to the conclusion that the parties intended that Pearle would occupy the premises.

In *Buford–Clairmont, Inc. v. Jacobs Pharmacy Company, Inc.,* 131 Ga.App. 643, 206 S.E.2d 674 (Div. 1 1974) the tenant defendant leased, for twenty (20) years, space in a shopping center for a store-cafeteria. It vacated the premises after an occupancy of only seventeen (17) months. The base rental was $2,278.00 a month or 2.5% of tenant's net sales whichever was greater. The lease provided that the tenant would not *abandon or vacate the leased premises* during the term of the lease. The court in holding that the tenant breached the lease when it ceased operating its business on the leased premises, stated

> ... There can be no question that tenant defaulted. The tenant's notification of July 6, 1972, that it was vacating the leased premises with no intention to return was a clear violation of Paragraph 7 forbidding an abandonment. Courts must recognize the realities of trade and commerce. In a shopping center, under agreements such as existed here, tenants actively operate their businesses as a part of the whole enterprise. This is shown by the provisions that made abandonment verboten and by other lease provisions as to joint activities such as parking areas. The agreement for a percentage rental based on receipts certainly indicated the parties intended a continuing business.

*See also, Ingannamorte v. Kings Super Markets, Inc.,* 55 N.J. 223, 260 A.2d 841 (1970); *Security Builders, Inc. v. Southwest Drug Co., Inc.,* 149 So.2d 319 (Miss. 1963); and *Oklahoma City Associates v. Wal–Mart Stores, Inc.,* 923 F.2d 791 (10th Cir.1991).

In the present case, Wal–Mart agreed to operate a discount store on the premises, agreed to pay a percentage rent, was the major tenant in the shopping center, and agreed that desertion of the premises would be a default. Based upon the above authorities and upon the clear meaning of the Lease and the uncontested facts in this case, this Court will enter an order finding that Wal–Mart has breached the Lease as a matter of law.

Wal–Mart argues and cites numerous cases that the *Use of Premises clause* in the present Lease is not a *continuous operations clause* but merely a clause that restricts the use of the premises, therefore, it could desert the premises at any time and not breach the lease as long as the premises were used for some lawful purpose (storage and meetings). *See Cascade Drive Limited Partnership v. Wal–Mart Stores, Inc.,* 747 F.Supp. 356 (E.D.La.1990); *Monte Corporation v. Stevens,* 324 P.2d 538 (Okl.1958); *Kretch v. Stark,* 26 O.O.2d 385, 193 N.E.2d 307 (1962); *Bank of Delaware v. Claymont Fire Company No. 1,* 528 A.2d 1196 (Del.Supr.1987); *Newkirk v. Millman Brothers, Inc.,* 16 Mich.App. 306, 167 N.W.2d 854 (1969); *Fay's Drug, Inc. v. Geneva Plaza Association,* 98 A.D.2d 978, 470 N.Y.S.2d 240 (1983). These cases are distinguishable from the present case in several instances. First, none of these cases involve a lease with an express provision that desertion or abandonment of the premises amounts to a breach of the lease. Secondly, they do not involve a major or anchor tenant in a shopping center where other tenants are dependent upon the presence of the major tenant such as Wal–Mart.

Wal–Mart also contends that since it had the right to assign the Lease at any time, it is not required to operate a discount busi-

ness on the premises. The Court rejects this argument because the assignment clause authorizing Wal–Mart to assign the Lease expressly states that even if the Lease is assigned, Wal–Mart is still bound by the obligations of the Lease. Wal–Mart, therefore, could not escape its duties under the Lease by assigning it.

Wal–Mart also contends that since it had a right to remove its fixtures and equipment at any time, this means that they can desert the premises without being in breach of the contract. The Court rejects this argument because the meaning of this provision of the Lease is merely to make clear that the fixtures and equipment are owned by Wal–Mart, not by the lessor. This clause does not mean that Wal–Mart can cease operations any time it wants to.

Wal–Mart's argument that it has not deserted the premises because it continued to pay rent must similarly be rejected. The default clause clearly designates failure to pay rent as a separate and distinct act of default. If "desertion of the premises" includes not paying the rent then there would be no purpose in making a failure to pay rent a separate act of default.

Finally, Wal–Mart contends that it has not deserted the premises because it is still using them for storage and meetings. This argument is rejected. The Use of Premises clause provides that Wal–Mart will use the premises for a discount store, but can use the store for any lawful purpose. This clause merely means that while Wal–Mart is operating a discount store it can also use the store for any other lawful purpose. It does not mean that Wal–Mart can discontinue using the premises for a store and use them for any other lawful purpose without being in default. In any event, the use of the premises for storage or meetings after a complete closing of the store is a mere subterfuge to try to avoid the consequences of a obvious desertion.

Wal–Mart has raised the affirmative defenses of waiver, estoppel and laches which will require an evidentiary hearing. The orders to be entered in this case pursuant to this Opinion will merely find that the Lease has not been rejected and has been breached by Wal–Mart. The Court will not decide the affirmative defense, issues or whether damages should be allowed, if the affirmative defenses are denied, until after an evidentiary hearing.