[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
CT Page 7352
The primary issue in this case is whether a tenant, having agreed to use and occupy demised premises as an office building, breaches the contract if it fails physically to occupy the building, and; if so, what damages flow from such a breach. The factual context, though fairly complex, is largely undisputed.
The predecessor of the plaintiff World Properties, LLC ("World"), a limited partnership called LAN Associates XII, L.P. ("LAN"), developed an office building in Enfield, apparently in the late 1980's. Prior to the discussions with the defendant First National Stores, Inc. ("First National"), the owner had experienced difficulty in leasing the premises and was in danger of losing the building through foreclosure. At the time of the negotiations, LAN occupied a portion of the fourth floor and was the only occupant of the building.[1] The financial dealings were arranged in such a way that First National's rent would cover the amounts due on the mortgage, and its rent payments were made directly to People's Bank, the first mortgagee.[2] First National also signed a Subordination, Non-Disturbance and Attornment Agreement ("SNDA") with People's Bank; and Koninklijke Ahold N.V. ("Ahold"), the parent company of First National, guaranteed the obligations of First National.[3]
The lease, which is the most critical document in the resolution of this dispute, was, of course, negotiated and executed at about the same time as the financing was arranged. Pursuant to the lease, the parties agreed that First National would lease from LAN approximately 108,000 of the approximately 113,000 square feet available in the building; the remaining 5,000 square feet would be used by the plaintiff for its office. In order to provide for a separate entrance, the plaintiff moved its operation from the fourth floor to a portion of the first floor. LAN agreed to complete the "Base Building Finish". The "Tenant Fit Up Work", the general specifications for which were attached as schedules to the lease, was either to be done by the plaintiffs general contractor,[4] or, if First National preferred, by another contractor; but if another contractor was chosen, First National would pay to the plaintiffs general contractor a 10% fee for supervising construction. The contemplated cost of the tenant fit up work was $1,620,000. It was estimated in the lease that construction would take 90 days. The lease was executed on December 4, 1995. CT Page 7353
The term of the lease was somewhat unusual. As fit up work was required, it was not altogether certain when First National would actually occupy the premises, and First National apparently wanted fifteen years at a minimum of occupancy. The term, then, was for fifteen years, and the commencement date was defined, in § 2.1 of the lease, to be the first day of the month following the date on which the premises were to be "ready for occupancy" as defined in § 4.2. Section 4.2, in turn, defined "ready for occupancy" as the time when LAN should have given ten days' notice that the premises were ready and that the fit up work had been substantially completed.[5]
In addition to the base rent, which, as noted above, essentially covered the financing costs, First National agreed to pay as additional rent real estate taxes, utility costs, insurance costs, and cleaning and maintenance expenses. The payment of"additional rent" was to be effective the later of 120 days after execution of the lease or the date of the owner's first debt service payment.
It is absolutely clear that at the time the lease was executed and for a short period of time thereafter, there was no question in any of the parties' minds that the fit up work would be completed and First National would occupy the building. An architect was hired by First National to plan the fit up work, and the work was put out to bid. First National formed employee teams to organize the planned move of the corporate headquarters to the premises in question. A tax abatement plan with the Town of Enfield was signed; the agreement contemplated several hundred employees moving to Enfield. Reale moved his office to the first floor of the building, as contemplated; First National advanced to him, to cover the expense of the move, $50,000 toward the amount which he or his company would realize from the construction work. Both sides to the transaction understood that Reale intended to develop the adjoining parcel which he, or a related entity, owns, and that occupancy of the building in issue would be helpful in the development of the other parcel.
Construction did not, however, proceed as planned. At first there were delays in planning and designing the construction. As the months in the early part of 1996 passed, however, another reason contributed to the delay: Ahold, the parent of First National, had purchased Stop Shop, another group of supermarkets, and the relocation of First National's corporate CT Page 7354 headquarters was apparently put on the back burner. Soon, many of the First National's managers were "downsized" or relocated, and Ahold abandoned its plans to locate corporate headquarters in Enfield. Ahold announced its corporate change of heart early in August, 1996. At about that time Reale met with representatives of First National, and, although by that time regular rent payments had been made, there were outstanding disputes as to items of "additional rent", the fee for construction, and the like.
In September, 1996, World brought the instant action. In the first of several complaints, World alleged in the first count that First National and Ahold breached their obligations under the lease by failing to pay real estate taxes, failing to insure the premises, and failing to occupy the premises; in the second count, the plaintiff sought a declaratory judgment that (1) the defendants had been required to pay real estate taxes since April 4, 1996; (2) that the defendants should have been insuring the premises since April 4, 1996, and (3) that First National had been obligated "to occupy" the premises since April 4, 1996. Several amended complaints were filed; the changes included the adding of a claim that the contract was breached by the failure to pay a construction manager's fee, by adding a third count claiming unjust enrichment by virtue of the owner's having left a partially installed sprinkler system on the premises, by adding claims regarding the maintenance and security of the premises and by adding a claim for injunctive relief. The defendants, in turn, filed an answer, defenses and counterclaim. The defenses and counterclaim allege that the plaintiff has breached the lease agreement in a variety of ways, including but not limited to failing to fix the roof, failing to cooperate in subletting the premises, and failing to complete "certain base improvements".[6] The defendant amended its counterclaims to include a claim for declaratory relief.
The above recitation recites the framework, largely undisputed, in which the more specific claims arise. Hearings were held on December 11, 1997, and February 6, 1998; several rounds of briefs were allowed and the last brief was filed on March 9, 1998. I have read the authority cited in the briefs and shall consider each claim seriatim.
 I
The first issue is whether First National breached the lease CT Page 7355 agreement by not moving into the building. It is of course true that:
 A lease is a contract. In its construction, three elementary principles must be kept constantly in mind: (1) the intention of the parties is controlling and must be gathered from the language of the lease in the light of the circumstances surrounding the parties at the execution of the instrument; (2) the language must be given its ordinary meaning unless a technical or special meaning is clearly intended; (3) the lease must be construed as a whole and in such a manner as to give effect to every provision, if reasonably possible. Hatcho v. Della Pietra, 195 Conn. 18, 20 (1985).
The plaintiff points to several clauses in the lease which, in light of the circumstances at the time of the signing of the lease, are claimed to have created a duty to occupy the premises. In the introductory portion of the lease, the following language appears:
 WHEREAS, the Tenant shall rent and occupy a portion of the building consisting of a gross rentable area of approximately 108,000 square feet . . . on a triple net basis, all in accordance with the terms and conditions herein contained and the considerations herein expressed, and . . . .
In the body of the lease, it is stated in § 6.1 that:
 The Tenant covenants and agrees to use and occupy the Leased Premises for office and related administrative purposes, subject to all applicable laws, ordinances, rules and regulations of any governmental boards or bodies having jurisdiction thereof
The plaintiff argues that the inclusion of the words "and occupy" in the above two clauses creates a duty physically to occupy the premises, such that recoverable damages may result from not occupying. The defendant claims that the "Whereas" clause, or recital, has little functional import and that the clause regarding use and occupancy of the premises is properly held to be a restrictive rather than a mandatory clause. While agreeing that all parties obviously anticipated that First National would occupy the premises, as is usually the case when a lease is signed, First National urges that the clauses do not create an affirmative duty to occupy.
Neither side presented Connecticut authority, other than CT Page 7356 general principles of contract construction, directly on point. As a very generalized proposition, the majority of cases from other jurisdictions have hesitated to find specific duties to occupy premises in the absence of a clearly stated obligation; and, because language to the effect that premises are to be used and occupied for some particular purpose is frequently used to restrict the purposes for which the premises may be used, use and occupancy clauses have usually been held to be restrictive rather than mandatory, at least in the absence of circumstances indicating a contrary intention. See, e.g., 49 Am.Jur.2d, Landlord and Tenant § 490, p. 405-08.
A discussion of illustrative cases may be useful. In Dickeyv. Philadelphia Minit-Man Corp., 377 Pa. 549, 105 A.2d 580
(1954), the Pennsylvania Supreme Court considered a clause which stated that the premises were to be "occupied in the business of washing and cleaning automobiles within the business of [the defendant] . . . and for no other purpose." The agreed upon rental amount was 12% of sales, with a minimum of $1800 per year. If the tenant defaulted, the landlord had the ability to terminate the lease. After a period of time, the landlord stopped using the premises for a major part of its retail business, so the rental payments dropped from a higher amount based on the percentage of sales to the lower minimum rental. The landlord sought to terminate the lease, based on the occupancy clause.
The Pennsylvania court held that the clause prohibited a noncomplying use and was not a covenant to use and occupy the premises. Although the landlord urged that the clause, in combination with the percentage of sales provision, created an implied covenant affirmatively to use and occupy the premises, the court stated that it would not find an implied covenant where an express clarifying covenant could have been used, unless the intention of the parties was so clear as to be undeniable. The court noted that the tenant ought not to be able deliberately to reduce sales on the premises for the purpose of thwarting the percentage of sales provision, but, so long as a legitimate business reason existed, the court ought not dictate how a business should be operated. Dickey, supra, at 105 A.2d 581-83.[7]
In Weil v. Ann Lewis Shops, 281 S.W.2d 651 (Tex.App. 1955), a clause in a lease provided for use and occupancy of the premises for the sale of certain sorts of clothing. After an extension of the prescribed time for beginning occupancy, the CT Page 7357 tenant decided not to occupy the premises at all, but continued to pay the base rent. The lease provided for rent of the higher of $650 per month or 5% of gross receipts. The court stated that the determinative issue was whether the lease, expressly or by necessary implication, created an affirmative duty to occupy. Noting that use and occupancy clauses traditionally are restrictive only, the court held that an implied covenant to occupy would be found only if such intention of the parties, as found in the lease language and the circumstances, was so clear that the parties thought it unnecessary specifically to express the covenant. That intent was not so clearly expressed in the circumstances of Weil.
In Palm v. Mortgage Investment Co. of El Paso, 229 S.W.2d 869
(Tex.App. 1950), the appellate court reversed the trial court, which had determined that the tenant violated a clause providing for occupancy and use as a shoe store when it largely discontinued operations in the premises and moved profitable operations to another location; there was also a clause providing for a base rent of $600 per month or 6% of sales. The Court of Appeals held that were a contract is written, the contract is presumed to embody the entire agreement and that additional implied covenants should be found only where absolutely essential. The court stated that courts perhaps would have difficulty trying to enforce necessarily vague notions of maximizing profits; though it suggested that the result might be different if the lease called for rental payments based on a percentage of sales only, with no base minimum. In that case, failing to occupy the premises would result in no income for the landlord, and it might be necessary in that situation to imply a covenant physically to occupy and use the premises. Palm, supra, at 874.
In Davis v. Wickline, 205 Va. 166, 135 S.E.2d 812 (1964), the Virginia Supreme Court held that a clause to the effect that the premises shall be used for the purpose of a drugstore and that during the term of the lease the lessee shall operate as a drugstore did not create an affirmative duty to operate as a drugstore; thus, when the lessee moved his store to another location, but continued to pay the monthly rent to the plaintiff landlord, he was not liable in damages. The court held, at 135 S.E.2d 814, that if the parties had intended to require continuous operation, then such a clause should have been included in the lease. See also Floste Corp. v. Marlemes,53 So.2d 538 (Fla. 1951). CT Page 7358
There are, to be sure, cases in which use and occupancy clauses, or variations thereof, have been construed as implied covenants of continuous occupancy. Although it may be hazardous to generalize, there are, in the facts of such cases, nearly always either other clauses in the leases or attendant circumstances which compel such a construction. In Ingannamortev. King's Super Markets. Inc., 55 N.J. 223, 260 A.2d 841 (1970), the plaintiff was the owner of a small shopping center; the defendant was assignee of the lessee. A clause in the lease stated that the premises were to be used and occupied only for a supermarket for the sale of various food items; various items were specifically not to be sold as well. The defendant ceased operations but continued to pay rent; the owner of the shopping center brought a cause of action seeking repossession of the premises. The trial court agreed with the lessor: because of the circumstances, the court found that the interest in operating a viable shopping center was central to the intent of the parties. There was no need to consider whether the lessor could compel continuous operation, as the relief was an order that the defendant either operate the premises as a market or vacate them. The Supreme Court held that the trial court's ruling was not erroneous in the circumstances.
In Slater v. Pearle Vision Center. Inc., 546 A.2d 676 ( Pa. Super. 1988), the trial court had sustained a demurrer to a complaint which alleged that a use and occupancy clause created an affirmative duty to occupy the premises. The appellate court reversed the trial court, and found that the circumstances were such that the complaint possibly could state a cause of action on which relief could be granted. The premises were part of a shopping center and, perhaps more critically, another clause in the lease allowed the premises to be vacant for up to sixty days. If a vacancy of up to sixty days were allowed, then vacancy of more than sixty days may be prohibited. The court reversed for further proceedings. See also Lilac Variety, Inc. v. Dallas TexasCo., 383 S.W.2d 193 (Tex.App. 1964) (a clause providing that the lessee "shall be doing business within 120 days" in a shopping center provided the basis for terminating the lease).
The case of Kroger Co. v. Bonny Corp., 134 Ga. App. 834,216 S.E.2d 341 (1975), discusses several factors which have been considered in the determination of whether a use and occupancy clause may create a duty to occupy continuously. One factor is whether the lease is assignable: if a lease may be freely CT Page 7359 assigned, there is less likely to be a duty to operate continuously. Location of the premises in a shopping center, as noted above, is a factor favoring such a duty. Although a clause providing that rent is based on a percentage of sales is a factor to be considered, the existence of a base minimum rent will generally compel a finding that the clause is restrictive rather than mandatory. But see Ayres Jewelry Co. v. O S Building,419 P.2d 628 (Wyo. 1966).
The above cases may be synthesized by holding that in the absence of compelling factors to the contrary, a use and occupancy clause will not be construed to create a mandatory duty to occupy. Because a clause specifically and unequivocally requiring occupancy or operation could have been expressly included in the lease, such a requirement will not be implied unless the lease read as a whole, in the circumstances then existing, makes the duty to occupy so clear that the express recital of the duty would have been redundant. Most of the attendant factors in the instant case do not compel a finding that the clause was intended to be mandatory.[8] The language of the use and occupancy clause itself, § 6.1, is standard. The immediate context of the clause is devoted to use of the premises: in § 6.2, hazardous activity is prohibited, and in § 6.3 the landlord represents that the premises are properly zoned for office purposes. The amount of rent due is not dependent upon use of the premises. Pursuant to § 9.1 of the lease, the lessee may freely assign the lease: this clause would tend to militate against finding an intent that First National was required to occupy the building.
As the plaintiff has aptly argued, there are several factors tending to suggest the opposite conclusion. At the time of the execution of the lease, the parties knew that Reale planned to develop his adjoining parcel, and it seems likely that actual occupancy of the first office building would facilitate the development and marketing of the second parcel. Although this factor has some weight, I do not find it as compelling as in the shopping center cases. Whatever detriment might result from non-occupancy is intuitively highly speculative, especially where the impacted buildings have not been constructed or, so far as we know, designed. Another factor cited by the plaintiff is that First National signed other agreements, with other entities, which specifically stated First National's intent to occupy the premises; these documents include the SNDA agreement with People's Bank and the Tax Assessment Agreement with the Town of CT Page 7360 Enfield. These documents are, obviously, agreements with different parties for different purposes; though they show once again the intent of First National to occupy the premises, at least as of December, 1995,[9] these documents are not very helpful in the determination of whether First National and the plaintiff intended to create an affirmative duty to occupy, the violation of which would be a breach of the lease for which damages could be awarded.
There are also circumstances which militate against construing the clause to be mandatory. The provisions for rent make do not tie the amount of rent due to any incidence of occupancy, such as, in the retail context, a percentage of receipts. There is a free assignability clause, which would seem to indicate no particular intent that First National itself was bound to occupy the premises. The building is free-standing, such that there is no direct and immediate effect on other rental properties, and, as noted above, any problems with the adjoining parcel are, at this point, rather speculative in any event. Perhaps most persuasively, there is no precise term in the lease, such as a continuing operations clause, creating an affirmative duty to occupy. These factors, in combination with the general rule that use and occupancy clauses are considered to be restrictive rather than mandatory, compel a holding that no duty to the plaintiff was breached by First National's failure physically to occupy the building.
 II
The plaintiff also claims that First National has the obligation to pay the real estate taxes pro rated for the period from December 31, 1995, to April 4, 1996. The lease was a "triple net" lease, and First National incurred the obligation to pay real estate taxes. The issue is when the obligation arose.
Section 3. B. of the lease provides for Additional Rent, of which real estate taxes are a part. That section states that the effective date of the obligation to pay operating costs is the later of 120 days after execution of the lease or the landlord's first debt service payment; there seems to be no dispute that 120 days after execution, or April 4, 1996, is the appropriate benchmark. The section of the lease referring specifically to real estate taxes, § 3.B.(a), states that the tenant shall be responsible for all "[r]eal estate taxes and assessments levied, and payable during the Lease Term. Landlord shall be responsible CT Page 7361 for any and all outstanding real estate taxes due and payable prior to the Commencement Date." The commencement date, in turn, is, pursuant to § 2 of the lease, defined to be the date on which the premises are ready for occupancy, as defined in § 4.2. The latter section, which as applied to the circumstances of this case does not ring with clarity, generally provides that the premises will be "ready for occupancy" when the tenant fit-up work is complete and a Certificate of Occupancy has been obtained.[10] The commencement date, then, has not yet occurred.
The documents regarding the adjustment of closing expenses perhaps shed some light on the matter. Exhibit 7 lists the various disbursements from the proceeds of the loans which financed the transaction. The scheme was to pay the old debts: the Town of Enfield, for example, was paid $262,112.08 in back real estate taxes. Additionally, People's Bank, the primary lender, was paid for four months in advance on its loans; this advance payment apparently anticipated a "down time" before the tenant would be able to move in physically. The four months period expired on April 4, 1996.
The plaintiff urges that because there may be some ambiguity in the anticipated dates concerning the payment of real estate taxes, parol evidence concerning the parties' unwritten intentions should be considered. In this regard, Mr. Reale testified, over objection, that his understanding at the time of the lease negotiations is that First National would be obligated to pay real estate taxes from January 1, 1996, on. I shall consider the evidence, in light of the somewhat confusing provisions of the lease as applied to the facts of this case, but I do not consider the evidence credible, for several reasons.
The intent expressed in the lease is, of course, the prevailing intent. Although there are some difficulties in determining the "commencement date", there is no difficulty in construing § 2.B. of the lease, which states that the responsibility of the tenant to pay additional rent begins, in the circumstances of this case, 120 days after the execution of the lease, which is April 4, 1996.[11] In these circumstances, it seems reasonably clear that the earliest time period for which First National would be liable for real estate taxes would be April 4, 1996. As First National has, albeit somewhat belatedly, paid real estate taxes from the period of time from April 4, 1996, to the present, I do not find a breach of the agreement by CT Page 7362 failing to pay taxes for the period from January 1 through April 4, 1996.[12]
 III
The plaintiff also claims that First National breached the lease by failing to pay Mr. Reale a construction management fee. As noted above, the lease contemplated that construction work would be done on the premises shortly after the lease was executed and, had the project gone as planned, at least ten percent of the construction cost would have been paid to Reale; if the work had been awarded to Reale's company, a profit would similarly have inured, most likely, to Reale's benefit. The difficulty with the plaintiff's position is that payment would follow and be in exchange for work done, and in the circumstances before us, no work has been done.
The section of the contract devoted to construction, § 4, does not appear to impose a duty on the tenant to commence the construction. Section 4.1(a) provides that the landlord is to complete the "base building finish" "upon execution of the lease". The landlord, if so instructed by Tenant, was to construct the Tenant Fit-Up Work. The tenant had the right to alter fit-up plans, so long as the changes were adequately compensated. The remainder of the section dealt with the ability of the tenant to substitute contractors, definitions of "ready for occupancy" date and other details of administration. If the tenant in fact had the duty to occupy, and did not occupy, then it might be argued that the projected profit may be an appropriate item of damages. Without a duty to occupy, however, the entire agreement as to construction is executory.[13]
Finally, it seems likely that the premises will indeed be "fit out". The plaintiff chose to bring this cause of action in the month following notice that First National would not be locating its corporate headquarters on the premises. Since that time, Ahold has been marketing the property and has received some expressions of interest. Ahold has stated its intention to abide by the terms of the lease when the interior is prepared for occupancy, and Reale will presumably receive some benefit at that time. Until that time, the defendants have not breached the contract by not paying the construction management fee.
 IV CT Page 7363
The final claim requiring discussion in any detail is raised in the plaintiff's sixth count. A[13] sprinkler system had been partially installed in contemplation of occupation by a prior putative tenant. The plaintiff claims that the existence of the partially installed system leads to a finding of unjust enrichment on the part of First National.
 Unjust enrichment is a very broad and flexible equitable doctrine . . . which has as its basis that" `it is contrary to equity and good conscience for the defendant to retain a benefit which has come to him at the expense of the plaintiff."' (citation ommitted) Its three basic requirements are (1) that the defendants were benefitted [benefited], (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to be plaintiffs' detriment . . . All of the facts of each case must be examined to determine whether the circumstances render it "just or unjust, conscionable or unconscionable," to apply the doctrine. . . . Bolmer v. Kocet, 6 Conn. App. 595, 612-14 (1986) (internal citations omitted).
According to Mr. Reale, the sprinkler system was purchased in 1990. The contract price was $153,000, and his company had paid $104,000. When the negotiations were taking place with First National, the parts of the sprinkler system were present in the building and, as noted above, parts of it had been installed. First National's architect testified that if the sprinkler system had been fully installed, a more beneficial floor plan could be implemented than if there were no sprinkler system; the fit-up plans apparently had never been finalized to the extent of incorporating the system in any particular way, and one of the engineers' plans apparently called for removing the system. In a letter to Mr. Reale dated March 20, 1996, the architect "appreciated that work has been partly done (on the sprinkler system) and that an adjustment is to be made for this work. Please advise how expenses will be distributed."
The sprinkler system was a minor, or perhaps even inconsequential, issue at the time the arrangements were negotiated. There was no mention of the system in the lease; the sprinkler system may well have been part of the modifications or additions that, it was contemplated, may have been encountered. It was simply not clear whether the sprinkler system was included in the $1,600,000 price which Real's company would have charged for the tenant fit-up. CT Page 7364
In these circumstances, it is difficult to find unjust enrichment. The first element, that First National has been benefitted [benefited], has not been proven. At least for now, First National has received no benefit from the presence of the system, and, depending on how the plans eventually work out, may never receive a benefit. It is also found that under all the circumstances of the case, there is no injustice in the defendants' not having paid for the system. The defendants have been paying substantial amounts under the lease for no immediate benefit, at this point, and Reale has received the benefit of an office space and a $50,000 advance against the management fee to cover the expense of his moving to the first floor. The issue of the sprinkler system has not, at this point, resulted in unjust enrichment.
 V
The remaining claims can be discussed more summarily. The plaintiff has alleged that the defendant breached the contract by failing to insure the premises, as required by the lease. The short answer is that the plaintiff agreed that insurance was in place by the summer of 1996, and, in any event, no claims have been made. There can be, then, no damages for any conceivable breach.
The plaintiff has alleged that First National has failed to provide security and maintenance as provided by the lease. It is not disputed that these services are required by the lease to be provided by the tenant. Both sides presented evidence on the issues. Without a detailed discussion, I find that the plaintiff has not sustained its burden of proof as to these issues.
The claims have been discussed in the context of the first count, which is specifically addressed to First National. The second count is addressed to Ahold as guarantor, and makes the identical substantive claims as were made in the first count. The same rulings are, then, made as to second count.
The third, fourth and fifth counts request declaratory judgments as to First National and Ahold, and injunctive relief as to First National. Consistent with the above holdings, judgment may enter in favor of the defendants on these counts. As no credible evidence was introduced as to the defendants' counterclaim, judgment may enter for the plaintiff on the counterclaim. The parties may submit their claims as to attorney's fees. CT Page 7365
Beach, J.