**P.V.C. Realty v. Weis Markets Inc.**

C.P. of Cambria County, no. 1995-639.

*George P. Faines,* for plaintiff.
*Willis A. Siegfried,* for defendant.

KRUMENACKER III, *J.,* December 19, 2000—This case arises out of an alleged breach of a commercial lease agreement entered into by the parties on January 5, 1968 and alleged tortious interference with contractual relations. The lease was for one of two anchor store spaces in the Park Village Plaza, a strip mall being built by plaintiff PVC near Hershey, Pennsylvania. The other anchor was to be a department store located at the opposite end of the plaza with space for numerous smaller stores in between the anchors. The agreement was for a term of 15 years with Weis having the option to renew the lease four times for five years a renewal.

Beginning in the early 1990s Weis began to need additional space at the plaza to expand its store in keeping with the changing demands of consumers. One such expansion took place but no more space was available in the plaza. In early 1992 a new mall was being constructed across the street from the plaza and Weis and the other anchor, K-Mart, decided to move their stores into the new center. K-Mart entered a lease termination agreement with PVC but Weis informed PVC that it had not yet determined what it would do about its lease in the plaza. During this time PVC began negotiating with Weis' rival Giant Foods to take over the vacant K-Mart space. At some point during these negotiations Weis became aware of PVC's efforts to replace the K-Mart store with a Giant.

In an attempt to terminate the Weis lease George Zamias traveled to Weis' headquarters to meet with Robert Weis and discuss the possibility of buying out Weis' lease. In this meeting Mr. Weis "basically said that he can't permit me to let Giant Foods go into my center. He

says 'I am building a super center or supermarket across the street, I can't have them across the street from me.' " N.T. Oct. 11, 2000, at pp. 51, 81. At this time Zamias offered Weis $500,000 to terminate the lease and clear the way for Giant to enter the plaza. *Id.* By letter dated February 24, 1993, Weis informed PVC that during the term of the lease Weis would not "consent to, nor permit the operation of, a supermarket in the Park Village Plaza other than the one operated by Weis Markets." Pl. exhibit 100. The letter goes on to say "Weis Markets stands ready to take whatever legal action is appropriate to protect its interests." *Id.*

PVC continued to attempt to negotiate a termination with Weis and while these efforts were ongoing PVC entered into a lease for the soon to be vacant K-Mart space with Giant on September 15, 1993. By its terms the lease with Giant would not begin until Weis' lease was cancelled or there was a court determination that Weis could not enforce paragraph 18. K-Mart vacated the plaza around February 10, 1994 and began operations at the new center. On February 17, 1994, Weis changed its store at the plaza to a Scot's Lo-Cost warehouse type supermarket. On June 20, 1994, Weis informed PVC that it is again exercising its renewal option for the plaza store. PVC during this time objected to a charge saying that the lease obligated Weis to operate a traditional supermarket and that the Scot's was not a supermarket. On February 24, 1995, PVC filed this action against Weis alleging that Weis: (1) breached the lease by failing to operate a supermarket in the plaza; (2) breached its duty to perform the lease in good faith; and, (3) tortiously interfered with both PVC's prospective and

actual contractual relations with Giant Foods. On May 15, 1995, the PVC-Giant lease terminated according to its terms and in late 1999 Giant announced plans to build a new supermarket in the area. Weis changed the Scot's store to a Save-A-Lot Supermarket in June 1996 and finally allowed its lease at the plaza to expire on October 31, 1999. PVC sold the plaza for $4 million on December 22, 1999.

Following a six-day trial a verdict in favor of PVC was rendered by a decision of 11 to one. The jury specifically found that Weis had breached its lease agreement and that the breach caused damage to PVC. Additionally the jury found that Weis had intentionally interfered with the PVC's contract with Giant and awarded damages for that conduct. In total the jury awarded actual damages of $6.5 million and punitive damages of $15 million. Weis timely filed a motion for post-trial relief, and on November 20, 2000, a hearing on defendant's motion was held. After consideration of the arguments presented at the November 20, 2000, hearing, the evidence presented in the case, the record in its entirety and the laws of this Commonwealth the court enters this opinion and order.

In its motion Weis alleges numerous errors that can best be addressed in the following four general categories: claims relating to breach of contract; claims relating to breach of implied duty of good faith and fair dealing; claims relating to tortious interference with contractual relations; and, claims relating to the damages awarded and the verdict.

## I. BREACH OF CONTRACT CLAIMS

### A. *Did the Court Err in Interpreting the Use Clause*

Weis first alleges a number of errors in the court's decision to allow the jury to consider PVC's breach of contract claim. Weis in its motion for summary judgment, motion for compulsory nonsuit, and motion for directed verdict raised these same issues. These arguments were rejected by a panel of this court at the summary judgment stage and by this court at trial.

Essentially Weis contends that the court's reading of the lease agreement to be restrictive and require them to operate a supermarket in the plaza is incorrect as a matter of law. Paragraph two of the lease, in part, provides "[t]he demised premises are leased to the tenant to be used and occupied for the operation of a supermarket offering for sale items generally offered for safe in other stores operated by tenant." Pl.'s exhibits 27 (amended lease agreement), 28 (lease agreement). Under the general rule established in *Dickey v. Philadelphia Minit-Man Corp.* 377 Pa. 549, 105 A.2d 580 (1954), Weis argues that this must be read as a permissive use clause not a restrictive one.

*Dickey* involved a lease that provided the leased premises were to be occupied for the purpose of washing and cleaning automobiles and for no other purpose. *Id.* at 551, 105 A.2d at 580. The defendant tenant had occupied the building for that purpose for a number of years but then limited its business to waxing cars and largely eliminated the washing aspect. The lessor sought to eject the defendant, contending that it was in breach of the

lease. The Supreme Court affirmed the trial court's grant of a demurrer to the landlord's complaint. It stated the issue as "[w]hether there was any implied obligation on the part of the lessee to continue to conduct the business on the premises of washing and cleaning cars if its failure to do so resulted in a diminution of rental payable to the lessor." *Id.* at 552, 105 A.2d at 581.

The lessor argued that since the rent was based on a percentage of the gross sales, there was an implied obligation of the tenant to continue the business on the premises to the fullest extent possible. The court rejected that argument, finding that the tenant's decision to change its business was made "in good faith and in the exercise of legitimate business judgment" and was not forbidden by any implied term of the lease. *Id.* at 556, 180 A.2d at 583. The holding of *Dickey* is that a use covenant like the one presented here cannot be read as an express requirement that the tenant only use the premises for the permitted purpose. See *Slater v. Pearl Vision Center Inc.,* 376 Pa. Super. 580, 546 A.2d 676 (1988). Further *Dickey* holds that there is no implied obligation that the tenant refrain from conducting its business in good faith and in accordance with sound business judgment.

*Dickey* established a general rule that use clauses are to read as permissive not restrictive. It is well accepted that all rules have their exceptions and that they do not cover all possible factual situations. Specifically what *Dickey* did not address was the situation present here, namely a lease for a premises which is part of a strip of stores where the economic health of each may be dependant on the others. *Slater,* 376 Pa. Super. at 585, 546 A.2d at 678. *Dickey* also did not address the situation where a plaintiff alleges that the defendant acted in bad

faith or lacked sound business judgment for its decision. While this court recognizes that *Dickey* precludes a finding that, absent evidence of bad faith or a lack of sound business judgment, the use provision alone required Weis to use the premises for the precise permitted use, that does not however end the inquiry. *Id.* at 585-86, 546 A.2d at 579. As the Superior Court recognized in *Slater* it is necessary to consider the lease agreement as a whole in determining if there may exist an implied obligation relating to the use of a leased premises. *Id.*

Interpretation of a contract, in this case a lease, poses a question of law for the court to decide. *Charles D. Stein Revocable Trust v. General Felt Industries Inc.*, 749 A.2d 978, 980 (2000). "In construing a contract, the intention of the parties is paramount and the court will adopt an interpretation which under all circumstances ascribes the most reasonable, probable, and natural conduct of the parties, bearing in mind the objects manifestly to be accomplished." *Village Beer & Beverage Inc v. Vernon D. Cox & Co. Inc,* 327 Pa. Super. 99, 107, 475 A.2d 117, 121 (1984). "If the language appearing in the written agreement is clear and unambiguous, the parties' intent must be discerned solely from the plain meaning of the words used." *Stein Revocable Trust,* 749 A.2d at 980. Moreover, "one part of a contract cannot be so interpreted as to annul another part[;] rather writings which comprise an agreement must be interpreted as a whole." *Shehadi v. Northeastern National Bank of Pennsylvania,* 474 Pa. 232, 236, 378 A.2d 304 (1977).

It is well established that "a lease is in the nature of a contract and is controlled by principles of contract law." *Cimina v. Bronich,* 517 Pa. 378, 383, 537 A.2d 1355, 1357 (1988). One such principle of contract law is what is of-

ten called the doctrine of necessary implication, which has been stated as follows:

"In the absence of an express provision the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract." *Slater,* 376 Pa. Super. at 586, 546 A.2d at 679 (quoting *Frickert v. Deiter Bros. Fuel Co. Inc.,* 464 Pa. 596, 347 A.2d 701 (1975)). Thus, where it is clear that an obligation is within the contemplation of the parties at the time of contracting or is necessary to carry out their intentions, the court will imply it. *Id.* See also, *Gallagher v. Upper Darby Township,* 114 Pa. Commw. 463, 473, 539 A.2d 463, 467 (1988). This is true even where the contract itself is not ambiguous. *Id.* Because the doctrine allows a court to enforce the clear intention of the parties and avoid injustice, not instruct the court which of two possible interpretations to apply, the court does not need to find an ambiguity before employing the doctrine.

Applying the doctrine to the case at bar, the court finds extensive evidence in the lease that these parties contemplated and intended that so long as Weis operated a business in this storefront it would operate a supermarket. Weis argues that paragraph 2 gave them a number of options relating to the space, specifically it allowed them the option to go dark[1] or sublease the space. When read as a whole paragraph 2 provided Weis with three op-

---

1. The "go dark" provision allowed Weis to close its store and cease operations at the plaza while continuing to pay rent to PVC.

tions: (1) they could operate a supermarket; (2) they could sublease any or all of the space for a use as something other than a supermarket; or (3) to go dark and continue to pay rent. If Weis chose to operate a business in that space it was required to operate "a supermarket, offering for sale items generally offered for sale in other stores operated by tenant." Pl.'s exhibits 28, 29. This conclusion seems apparent from reading the lease as a whole and from viewing the context in which the lease was negotiated.

Paragraph 18 of the lease is an exclusivity provision that permitted Weis to prevent PVC from allowing another supermarket to take up residence in the plaza. The obvious purpose for Weis having this clause included was to protect the supermarket it intended to operate in the plaza from competition. If the parties had not intended for Weis to operate a supermarket and no other business it is unlikely paragraph 18 would have been included. Further, the lease incorporated the plans and specifications for the space Weis was to occupy. Pl. exhibit 29. These plans were based on the Weis supermarket being operated in Altoona, Pennsylvania at the time the store opened in the plaza, and show that the parties intended for Weis to operate a full line supermarket in the leased space.

At the time of the initial negotiation Weis operated only Weis supermarkets and engaged in no other businesses. N.T. Oct. 16, 2000 at pp. 133-34. There was no indication that at the time the lease was entered Weis was considering entering any other business and so the parties could only have intended that they would operate a supermarket in that space. Weis' vice-president of

operations, Edward Rakoskie, testified that the first Scot's was not opened until the 1980s. *Id.* at pp. 138-39. Further, at the time of negotiating the original lease PVC and Weis knew that the store would be in a strip mall complex and that the optimal mix for such a center was a department store at one end and a supermarket at the other. N.T. Oct. 12, 2000 at p. 141. Weis required a specific assurance from PVC that the other main tenant would be a department store. N.T. Oct. 11, 2000 at p. 31. Similarly, the department store sought assurances that a supermarket would be in the plaza and the smaller tenants sought assurances that the anchors would be a department store and supermarket respectively. *Id.*

A number of witnesses, for both PVC and Weis, testified that the success of a strip mall, such as this one, is made up of interdependent economic units and that the success of the individual units depends in large part on the success of the main anchors. See N.T. Oct, 11, 2000 at pp. 10-14, 18-19, 97-98 (testimony of George Zamias); N.T. Oct, 12, 2000 at pp. 25-27 (testimony of George Zamias); N.T. Oct. 12, 2000 at pp. 143-44 (testimony of Samuel Zamias); N.T. Oct. 17, 2000 at p. 220 (testimony of Emanuel Halper). In *Slater,* the Superior Court acknowledges the unique nature of such leases and that the landlord has an interest in the continued operation of the individual businesses beyond mere rent. *Slater*, 376 Pa. Super. at 589, 546 A.2d at 680 (quoting *Ingannamorte v. Kings Super Markets Inc.,* 55 N.J. 223, 260 A.2d 841 (1970) ("But these cases and others like them, did not involve the precise use and occupancy language in the lease before us and, much more to the point, did not involve a situation where, as here, there were interdepen-

dent economic units and the landlord had an obvious interest in the continued active operation of the leased premises far beyond the mere payment of the fixed monthly rental.").

This unique relationship has been recognized by other jurisdictions. See *Ingannamorte v. Kings Super Markets Inc.*, 55 N.J. 223, 260 A.2d 841 (1970); *Lilac Variety Inc. v. Dallas Texas Comp.*, 383 S.W.2d 193 (Tex. Civ. App. 1964). In *Lilac Variety* the owner of a suburban shopping center leased a retail store for 15 years to T G & Y stores and shortly thereafter leased the center's supermarket, as planned and as set forth in a provision of T G & Y's lease, to the A. C. F. Wrigley stores. The supermarket was operated for a while and was then closed with Wrigley continuing to pay rent. T G & Y stores then sought and obtained a judgment entitling it to cancel its lease because of the closing of the supermarket. The court found sufficient implication of a requirement that the supermarket would continue operation. In the course of its opinion it said:

"We think it is common knowledge that the volume of pedestrian traffic at the site of a retail merchandising business is a factor which affects the gross sales potential of the business. That being so the purpose and the importance to appellants of the lease provisions with reference to a supermarket are obvious. Plainly the parties intended that a supermarket should be in operation during the term of the lease." *Id.* at 196. See also, *Ingannamorte* 55 N.J. 223, 229, 260 A.2d 841, 844 (1970).

Since the parties were familiar with the strip mall industry they knew not only the typical makeup of these

malls but also of the high degree of interdependence of the stores. The parties intended the store makeup of the plaza to be same as a typical strip mall; that meant Weis would operate a full line supermarket. The sublease option in paragraph two recognizes the interdependence of the stores by requiring that Weis would not use or allow the space to be used for any use which conflicted with another lease or which would depreciate the value of the plaza, and that no ultra-hazardous activity would take place. Pl. exhibits 28, 29.

When viewing the lease as a whole and in the appropriate context, both historically and in the special context of a strip mall landlord/tenant relationship, it is clear the parties intended that Weis itself would operate a supermarket or nothing in the leased space and could sublet the space if it so chose. In doing so Weis would enjoy a symbiotic relationship with the other tenants of the plaza in which they and PVC would all benefit. Additionally so long as Weis operated its supermarket it would enjoy the benefits of the exclusivity provision.

Further, PVC specifically alleged that Weis acted in bad faith and acted in a manner destructive to competition and to PVC without a sound business reason. As indicated above, *Dickey* did not address this issue. The court in *Dickey* wrote "[n]or is there anything in the present case to indicate that defendant's action in discontinuing the washing and cleaning of cars except as incidental to simonizing and polishing was taken other than in good faith and in the exercise of legitimate business judgment." *Dickey,* 377 Pa. at 556, 105 A.2d at 583. The Pennsylvania Supreme Court allowed room to alter the general rule they were pronouncing in instances where

bad faith was alleged. In the case at bar not only was bad faith alleged but it was proven as shown by the jury's verdict.

This is further evidenced by the cases that the *Dickey* court distinguished. At least two of the cases involved situations in which the defendants engaged in actions based on bad faith or other improper motives. *Id.* at 555-56, 105 A.2d at 582-83. In *S. P. Dunham & Co. v. 26 East State Street Realty Co.,* 134 N.J. Eq. 237, 35 A.2d 40, the lessee, which conducted a general department store business on the demised premises, removed two of its most lucrative and remunerative departments from the demised premises to the second floor of another building in an endeavor to diminish the percentage rental on the gross sales provided for in the lease. In *Garden Suburbs Golf & Country Club Inc. v. Pruitt,* 156 Fla. 850, 24 So.2d 898, where the lease obligated the lessee to pay as rent a specified percentage of gross receipts of any business conducted by him on the premises, it was held that he could not evade such obligation by subletting portions of the premises or granting concessions not authorized by the lease, thereby depriving the lessor of a percentage of the gross receipts realized from the business of such subleases and concessionaires.

In this case, like those distinguished in *Dickey,* there was an allegation of bad faith and/or improper motive. Indeed PVC's breach of the duty of good faith claim and their tort claim required evidence of bad faith and/or improper motive or conduct by Weis to be successful. As evidence of bad faith and/or improper motive the jury had before it evidence of the changes Weis made in the stores, *e.g.,* removing the bakery, meat, fresh vegetables

and produce, N.T. Oct. 12, 2000 at pp. 42-43; of the substantial drop in revenues from over $6.5 million in 1993 when the store was operated as a Weis to $243,626 in 1995, the first full year as a Scot's, to just over $1 million in a year of operation as a Save-A-Lot, see pls. exhibit 502; N.T. Oct. 11, 2000 at pp. 97-100; N.T. Oct. 16, 2000 at pp. 85-86; that this drop in revenues likely had a negative impact on the plaza because it indicated a drop in shopper traffic, *id.;* and, of the statements made by Mr. Weis in his meeting with Mr. Zamias that Weis could not allow Giant into the area, N.T. Oct. 11, 2000 at pp. 51, 81.

The jury's verdict in favor of PVC on the breach of good faith and the tort causes of action shows that they believed Weis acted in bad faith and/or an improper motive. *Dickey* does not address this factual scenario and by distinguishing these cases our Supreme Court recognizes that if bad faith or bad motive is present the general rule is inapplicable. For both of these reasons the court's interpretation of the use clause in paragraph two of the lease was correct and it was therefore proper to allow the jury to consider the breach of contract claim.

### B. *Should a Judgment N.O.V. Be Granted on the Issue of Breach*

Weis contends that even if it were proper to allow the jury to consider the breach of contract issue the jury's verdict was erroneous or based on inadmissible parol evidence. To this end Weis asks the court to enter a judgment n.o.v. in their favor on the issue of whether they were in breach of the lease as determined by the court. In reviewing a motion for judgment n.o.v. "the evidence

must be considered in the light most favorable to the verdict winner, and he must be given the benefit of every reasonable inference of fact arising therefrom, and any conflict in the evidence must be resolved in his favor." *Broxie v. Household Finance Company*, 472 Pa. 373, 380, 372 A.2d 741, 745 (1977). "Moreover, a judgment n.o.v. should only be entered in a clear case and any doubts must be resolved in favor of the verdict winner." *Moure v. Raeuchle*, 529 Pa. 394, 402, 604 A.2d 1003, 1007 (1992). Further, "a judge's appraisement of evidence is not to be based on how he would have voted had he been a member of the jury, but on the facts as they come through the sieve of the jury's deliberations." *Id.* (quoting *Brown v. Shirks Motor Express*, 393 Pa. 367, 375, 143 A.2d 374, 379 (1958)).

Our Supreme Court has stated:

"There are two bases upon which a judgment n.o.v. can be entered: one, the movant is entitled to judgment as a matter of law . . . and/or two, the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant, . . . . With the first a court reviews the record and concludes that even with all factual inferences decided adverse to the movant the law nonetheless requires a verdict in his favor, whereas with the second the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure." *Moure*, 529 Pa. at 402-403, 604 A.2d at 1007.

In this case, having determined as a matter of law that the lease required Weis to operate a supermarket in the plaza, it was a question of fact for the jury to determine

if Weis had breached this obligation. The lease does not define the term "supermarket" and in the absence of technical terminology, we give the words used in an agreement their plain and ordinary meaning. *Warren v. Greenfield,* 407 Pa. Super. 600, 607, 595 A.2d 1308, 1311-12 (1991). See also, *Stein Revocable Trust,* 749 A.2d at 981 (looking to Webster's Third New International Dictionary, unabridged to define "occupancy" and "possession"); *Herr v. Grier,* 448 Pa. Super. 216, 220, 671 A.2d 224, 226 (1995) (looking to Webster's New Collegiate Dictionary for definition of "auto").

The dictionary[2] defines supermarket as "a departmentalized self-service chain or independent retail market that sells foods, convenience goods, and household merchandise arranged in mass display." Webster's Third New International Dictionary, unabridged (1969). The jury was provided this definition and instructed to apply it to the evidence[3] presented to determine if the stores operated by Weis, namely the Scot's Lo-Cost and Save-A-Lot, were supermarkets. It is implicit in the jury's verdict in favor of PVC on the issue of breach of contract that either or both of these stores were not, in the jury's opinion, supermarkets.

2. Since the lease was drafted in 1968 it was necessary to locate a definition from that era. A search of local libraries failed to turn up a dictionary from the late 1960s and the court originally intended to use a 1971 definition. In an attempt to obtain a definition that was more contemporaneous with the lease Merriam-Webster was contacted directly and provided this definition from their archival copies of the 1966 and 1969 Webster's Third New International Dictionary, unabridged. The court would like to thank Maria Sansalone, a cross-reference editor with Miriam-Webster, for her assistance.

3. The jury heard testimony regarding and viewed nearly one hundred photographs of the contents of the two stores.

This definition does not set forth how much or what items within each category the store must sell and so such matters must be left to the jury to determine from their collective life experiences. From the evidence presented it was possible for the jury to determine by applying its combined experience and the court's definition to the facts as found by them that the quality and/or quantity of food or other items sold was insufficient to allow either or both of the stores to be called a supermarket. Further, the definition requires the merchandise be sold at retail and there was testimony that both stores sold items at a discounted rate, *i.e.,* below retail. N.T. Oct. 13, 2000 at p. 122; N.T. Oct. 16, 2000 at pp. 146, 171-73, 178, 181-82. In addition Weis' own annual report referred to the Scot's as a "warehouse type market," see pl. exhibit 61 at p. 2; N.T. Oct, 11, 2000 at p. 75, which combined with the testimony regarding prices of the merchandise supports the jury's determination the definition was not met. Combining the failure to meet this part of the definition with the imprecision of the rest of the definition it was possible for the jury to find that the stores were not supermarkets.

Weis is also concerned that the jury heard inadmissible parol evidence as to the parties' intent when they entered the lease. Specifically, George Zamias was allowed to testify that he bargained for a full line, traditional Weis supermarket to occupy the space in the plaza when the 1968 lease was entered. N.T. George Zamias at pp. 19-22. In its August 30, 2000 order the court determined that the lease was "clear and unambiguous and [does] not require expert testimony or parol evidence to ascertain [its meaning]." Mr. Zamias' testimony did not

seek to expand the lease or vary the parties' intent as found by the court. Mr. Zamias' testimony offered an explanation as to why the lease incorporated the plans and specifications of the Weis store in Altoona.

Weis also argues that the testimony of Mr. Zamias and others, including witnesses for Weis, as to what they believed a supermarket was, also was improperly considered by the jury. Mr. Zamias and others testified what they believe a supermarket to be, in so doing the listed specific departments and items they felt should be in a supermarket. N.T. Oct. 12, 2000 at p. 43 (testimony of George Zamias), p. 87 (testimony of William Trevorrow), p. 165 (testimony of Samuel Zamias). Defense counsel read the court's definition[4] of a supermarket to Mr. George Zamias and asked him if he agreed or disagreed with it. *Id.* at p. 42. Mr. Zamias stated, in part, "I can't say that is a true definition of supermarket. A supermarket carries fresh goods, fresh fruits, vegetables. As I explained earlier, they have a baker, a butcher, meat store, all of that, which none of this occurred at the Scot's Lo Cost, [sic] none of it." *Id.* at pp. 42-43. This statement is not parol evidence nor was it prejudicial to defendant because, as noted above, the definition supplied by the court left undefined some of the key terms used in the definition of a supermarket. It was for the jury to decide how much and what type of each item is necessary for a store to be a supermarket. In so doing it was not impermissible for witnesses to offer their interpretations but in the end it was for the jury to apply the definition and its combined

4. Counsel used the 1971 definition that the court had available at the time. The 1971 version Mr. Siegfried used in his question and the 1969 definition used in jury instructions are nearly identical.

experience to the facts to determine if the Scot's and Save-A-Lot were in fact supermarkets. In doing so they were the finders of fact and entitled to give what weight they decided proper to the testimony of the various witnesses.

The court instructed the jury that it and it alone, would interpret the lease. In final jury instructions the court instructed the jury that the lease required Weis to operate a supermarket in the plaza and it provided a definition to them against which to judge the stores Weis operated. Weis gives the testimony about what certain witnesses thought a supermarket is too much weight. There is nothing to suggest that the jury disregarded the court's definition in favor of one suggested by a witness. In fact, as noted above, the dictionary definition is not a precise one and is, on certain matters, open to interpretation. Reviewing the evidence that supports the verdict in a light most favorable to the verdict winner and resolving all reasonable inferences in their favor the court finds that this is not one of those clear cases in which the jury's verdict should be altered. Therefore, on the breach of contract issue the jury's verdict will not be disturbed.

### C. *Should a New Trial Be Granted Because the Jury Heard Inadmissible Parol Evidence As to the Parties' Intent When Entering the Lease*

Our Supreme Court has repeatedly emphasized that it is not only a trial court's inherent fundamental and salutary power, but its duty to grant a new trial when it believes the verdict was against the weight of the evidence and resulted in a miscarriage of justice. *Burchard v. Seber,* 417 Pa. 431, 438, 207 A.2d 896, 899 (1965). See also,

*Frisina v. Stanley,* 409 Pa. 5, 7, 185 A.2d 580, 581 (1962); *Craft v. Hetherly,* 700 A.2d 520 (Pa. Super. 1997). Although a new trial should not be granted because of a mere conflict in testimony or because the trial judge on the same facts would have arrived at a different conclusion, a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail. *Burrell v. Philadelphia Electric Company,* 438 Pa. 286, 265 A.2d 516 (1970).

The evidence defendant complains of in this argument is the same addressed in part I. B., namely the testimony of Mr. Zamias as to intent and his and other witnesses' testimony as to what makes up a supermarket. For the reasons discussed above there is no reason to believe that the jury's verdict is against the weight of the evidence. Nor is there reason to believe that the jury gave greater weight than was deserved to the testimony of certain witnesses or that they disregarded the instructions of the court. In any event it is the function of the jury to weigh the credibility of witnesses and assign what weight they believe is proper to witnesses' testimony. In determining what weight to give to Mr. Zamias' testimony the jury could consider not only Mr. Zamias' own testimony and demeanor, but also the testimony of defendant's witness Emanuel Halper who stated "I think [George Zamias is] very reputable." N.T. Oct. 18, 2000 at p. 33. Here there is no suggestion that the jury gave undue weight to any one witness or piece of evidence. The evidence they did have to consider was in conflict

and it was a function of the jury to resolve that conflict and render a just verdict. As the verdict does not appear to be against the weight of the evidence there is no reason to order a new trial based upon this ground.

## II. BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

### A. *Was It Proper To Allow the Issue of Breach of the Implied Duty of Good Faith To Go to the Jury*

Weis argues that it was improper to allow the jury to consider the question of whether they breached an implied duty of good faith and fair dealing because Pennsylvania does not recognize such a cause of action. Although the extent to which such a claim is cognizable under our law is unclear, it is clear that such a cause of action exists. See *Kaplan v. Cablevision of Pa. Inc.*, 448 Pa. Super. 306, 318, 671 A.2d 716, 721-22 (1996) (no limit on circumstances in which duty recognized); *PennDOT v. E-Z Parks Inc.*, 153 Pa. Commw. 258, 268, 620 A.2d 712, 717 (1993) (duty recognized in limited circumstances); *Somers v. Somers*, 418 Pa. Super. 131, 136-39, 613 A.2d 1211, 1213-15 (1992) (no limit on circumstances in which duty recognized); *Creeger Brick and Building Supply Inc. v. Mid-State Bank and Trust Co.*, 385 Pa. Super. 30, 35-37, 560 A.2d 151, 153-55 (1989) (duty recognized only in limited situations); *Liazis v. Kosta Inc.*, 421 Pa. Super. 502, 510, 618 A.2d 450, 454 (1992) (citing *Germantown, infra,* and recognizing no limits on the duty); *Germantown Manufacturing Co. v. Rawlinson*, 341 Pa. Super. 42, 60-61, 491 A.2d 138,

148 (1985) (no limit on circumstances in which duty recognized).

Courts, once unwilling to add language to contracts, are now less concerned with the formalism of language and more concerned with determining and enforcing the true intent of the parties. As Justice Cardozo wrote: "The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal. It takes a broader view today. A promise may be lacking, and yet the whole writing may be 'instinct with an obligation,' imperfectly expressed." *Wood v. Lucy Lady Duff-Gordon,* 222 N.Y. 88, 91, 118 N.E. 214, 214 (1917). (citation omitted) The general duty of good faith and fair dealing as found in the Restatement (Second) of Contracts §205 was adopted in this Commonwealth in *Germantown Mfg. Co. v. Rawlinson,* 341 Pa. Super. 42, 60-61, 491 A.2d 138, 148 (1985).

Section 205 reads "[e]very contract imposes on each party a duty of good faith and fair dealing in its performance and its enforcement." Restatement (Second) of Contracts §205 (1981). A similar requirement has been imposed on those contracts which come within the Uniform Commercial Code by 13 Pa.C.S. §1203. Good faith has been defined as "[h]onesty in fact in the conduct or transaction concerned." 13 Pa.C.S. §1201 (West 2000). The obligation to act in good faith in performing contractual obligations varies somewhat with the context, *Somers,* 418 Pa. Super. at 136, 613 A.2d at 1213, and it cannot, therefore, be precisely defined in all circumstances.

Some examples of bad faith conduct include, but are not limited to, "evasion of the spirit of the bargain, lack

of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Kaplan,* 448 Pa. Super. at 318, 671 A.2d at 772 (citing *Somers,* 418 Pa. Super. at 136, 613 A.2d at 1213 and the Restatement (Second) of Contracts §205(d)). Finally, a similar requirement of good faith and fair dealing has been imposed under the doctrine of necessary implication.[5] *Somers,* 418 Pa. Super. at 137, 613 A.2d at 1214.

Therefore, whether under the doctrine of necessary implication, or the Restatement's implied duty of good faith performance of contracts, or the U.C.C's requirement of honesty in fact in the conduct or transaction concerned, it is clear that PVC has stated a claim for breach of contract based upon the implied duty of good faith and fair dealing. See *Somers,* 418 Pa. Super. at 137, 613 A.2d at 1214. In the instant case, there is no express term in the contract requiring Weis to act in good faith. Nor is there an express term requiring Weis to perform those things according to reason and justice which must be done so as not to injure PVC's right to receive the fruits of the contract. However, under our case law, these obligations are implied in the contract between PVC and Weis. For these reasons it was not error to allow the jury to consider PVC's claim that Weis breached its duty of good faith and fair dealing.

---

5. Discussed in part I. A. *supra.*

## B. *Should a Judgment N.O.V. Be Entered in Weis' Favor on the Issue of the Implied Duty of Good Faith and Fair Dealing*

The standard for a judgment n.o.v. is addressed in part I. B., *supra*. After applying that standard to this claim the court again finds that this is not one of those clear cases in which the jury's verdict should be disturbed.

## C. *Should a New Trial Be Ordered Because of an Erroneous Jury Instruction on the Good Faith Issue[6]*

Weis properly argues that an implied covenant cannot alter the express language of a written contract. They go on to conclude that this court's earlier determination that the contract required Weis to operate a supermarket in the plaza and that so long as they did paragraph 18 gave them the right to keep other supermarkets out, does not permit the jury to consider PVC's bad faith claim. Weis' argument fails to recognize that although the lease gives them the right to exclusivity they must still act in good faith when attempting to enforce that right. Further, that right only exists if they are operating a supermarket.

The jury instruction on this subject, in part, reads:

"I have also determined as a matter of law, that the lease permitted Weis Markets to restrict the operation of another food supermarket, a principal business of which is the sale of foodstuffs at retail, within the Park Village Plaza. It is for you to decide if Weis Markets breached

---

6. The standard for determining when a new trial should be granted is discussed in part I. C. *infra*.

this duty of good faith in this matter . . . ." N.T. Oct. 18, 2000 at p. 205.

Based on the evidence presented in this case it was possible for the jury to find that Weis acted in bad faith when they informed PVC they would seek to enforce the exclusivity provision if Giant came into the plaza. It is also possible for the jury to have found that Weis, after it lost the right to enforce the exclusivity provision by failing to operate a supermarket, acted in bad faith by continuing to prevent PVC from bringing in a new supermarket anchor, which had a detrimental effect on the entire plaza. Because the evidence supports the jury's finding that Weis was in breach of the lease either because it failed to operate a supermarket or because it was in breach of the implied duty a new trial is not proper.

## III. TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

Weis claims that it was improper to allow the jury to consider the issue of whether or not it improperly interfered with PVC's lease with Giant. PVC alleged that Weis improperly and intentionally interfered with its prospective and actual contractual relations with Giant. Pennsylvania recognizes a separate cause of action for each of these torts. The cause of action for interference with prospective contractual relations was considered by the Superior Court in *Yaindl v. Ingersoll-Rand Co. Standard Pump-Aldrich Division,* 281 Pa. Super. 560, 580-81, 422 A.2d 611, 621-22 (1980). In its discussion of the subject the court quotes and approves of the tort as defined in the Restatement (Second) of Torts §766B. *Id.* Section 766 reads:

"One who intentionally and improperly interferes with another's prospective contractual relation [(except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation,] whether the interference consists of

" (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

"(b) preventing the other from acquiring or continuing the prospective relation." *Id.* at 581, 422 A.2d at 622 (quoting the Restatement (Second) of Torts §766B (1979)).

Here, PVC's claim on this cause of action failed and was not presented to the jury because they actually entered into a written lease with Giant. As soon as the Giant lease was signed the relationship between PVC and Giant ceased to be prospective and became actual. Logically then a cause of action for interfering with prospective contractual relations could not lie.

PVC also alleged that Weiss interfered with the actual contract that PVC had with Giant. The cause of action for interference with existing contractual relations is defined in the Restatement (Second) of Torts §766 which states:

"One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract." Restatement (Second) of Torts §766 (1979). See also, *Adler, Barish, Daniels,*

*Levin and Creskoff v. Epstein,* 482 Pa. 416, 393 A.2d 1175 (1978), *appeal dismissed,* 442 U.S. 907, 99 S.Ct. 2817, 61 L.Ed.2d 272 (1979); *Strickland v. University of Scranton,* 700 A.2d 979 (Pa. Super. 1997); *Maier v. Maretti,* 448 Pa. Super. 276, 671 A.2d 701 (1995); *Temporaries Inc. v. Krane,* 325 Pa. Super. 103, 472 A.2d 668 (1984); *Yaindl,* 281 Pa. Super at 573-74, 422 A.2d at 618.

From this definition the courts of this Commonwealth have distilled four elements necessary to prove a cause of action for intentional interference with contractual relations. These four elements are: (1) the existence of a contractual relationship; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship; (3) the absence of a privilege or justification for such interference; and (4) damages resulting from the defendant's conduct. See *Strickland,* 700 A.2d at 985; *Triffin v. Janssen,* 426 Pa. Super. 57, 63, 626 A.2d 571, 574 (1993) (citing *Neish v. Beaver Newspapers Inc.,* 398 Pa. Super. 588, 599, 581 A.2d 619, 625 (1990)).

There is no dispute over whether the first element is satisfied since PVC had entered into a lease with Giant. In explaining the second element the Superior Court has said it "must be understood as requiring only an intention to interfere with the plaintiff's [] contractual relation, and not malevolent spite by the defendant." *Yaindl,* 281 Pa. Super. at 581 n.11, 422 A.2d at 622 n.11. Further, the Restatement (Second) of Torts specifically states that the defendant's ill will is not an element of the tort Restatement (Second) §§766, comment r, 766B, comment f (1979) ("Ill will on the part of the actor toward the person harmed is not an essential condition of liabil-

ity under the rule stated in this section. He may be liable even when he acts with no desire to harm the other"). See also, Restatement (Second) of Torts §§766B, comment d, 767, comment d (1979). Here there was sufficient evidence presented to allow the jury to conclude that Weis acted with the necessary intent to interfere with the PVC-Giant lease.

The third element focuses on the absence of a privilege or justification for the actor's interference. The Restatement of Torts §766 focused on the question of privilege, while the Restatement (Second) of Torts §766 changes the focus to whether the actor's conduct was proper. Comment b to the Restatement (Second) explains the shift in inquiry:

"Unlike other intentional torts such as intentional injury to person or property, or defamation, this branch of tort law has not developed a crystallized set of definite rules as to the existence or non-existence of a privilege to act in the manner stated in sections 766, 766A or 766B. Because of this fact, this section is expressed in terms of whether the interference is improper or not rather than in terms of a specific privilege to act in the manner specified. The issue in each case is whether the interference is improper or not under the circumstances, whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another." Restatement (Second) of Torts §766, comment b (1979).

This view has been adopted by the Superior Court in *Yaindl* which states that "the third element, 'the absence of privilege or justification on the part of the defendant,'

is merely another way of stating that the defendant's conduct must be improper." *Yaindl,* 281 Pa. Super. at 581 n.11, 422 A.2d at 622 n.11. See also, *Yaindl,* at 575, 422 A.2d at 619. In determining whether a particular course of conduct is improper for the purposes of setting forth a cause of action for intentional interference with contractual relations, the courts have consistently looked to section 767 of the Restatement (Second) of Torts which provides as follows:

"In determining whether an actor's conduct in intentionally interfering with an existing contract or a prospective contractual relation is improper or not, consideration is given to the following factors:

"(a) The nature of the actor's conduct,

"(b) The actor's motive,

"(c) The interests of the other with which the actor's conduct interferes,

"(d) The interests sought to be advanced by the actor,

"(e) The proximity or remoteness of the actor's conduct to the interference and

"(f) The relations between the parties." Restatement (Second) of Torts §767 (1979). See also, *Adler,* 482 Pa. at 433, 393 A.2d at 1184; *Strickland,* 700 A.2d at 985; *Triffin,* 426 Pa. Super. at 63-64, 626 A.2d at 574; *Yaindl,* 281 Pa. Super. at 574, 422 A.2d at 618. In addition, comment b to section 767 provides:

"The issue in each case is whether the interference is improper or not under the circumstances; whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without li-

ability, despite its effect of harm to another. The decision therefore depends upon a judgment and choice of values in each situation. This section states the important factors to be weighed against each other and balanced in arriving at a judgment; but it does not exhaust the list of possible factors." Restatement (Second) of Torts §767 comment b (1979).

Weis suggests its statement that it would enforce the exclusivity provision of the lease is absolutely privileged and as such PVC cannot satisfy the third element. Weis relies on section 773 of the Restatement (Second) of Torts to support its argument. Section 773 explains that one who asserts in good faith a legally protected interest of his own or threatens in good faith to protect that interest by appropriate means does not act improperly. Restatement (Second) of Torts §773 (1979). The essence of the section 773 privilege is that the party act in good faith. It was a question of fact for the jury whether Weis acted in good faith when asserting the exclusivity provision of the lease. There was evidence presented to the jury upon which they could find that Weis did not act in good faith when threatening to enforce the exclusivity provision. As discussed above one of PVC's claims was that Weis breached the implied duty of good faith and they presented evidence to support that claim which the jury considered in determining if Weis properly asserted the exclusivity provision of paragraph 18.

Finally, the fourth element requires that Weis' conduct result in actual legal damage to PVC. Here, PVC presented evidence that because of Weis' conduct it was unable to perform the Giant lease which resulted in lost profits and ultimately had a detrimental effect on the

shopping plaza. Here the lease with Giant included a condition prerequisite that Weis either have vacated the plaza or that PVC obtain a ruling that the exclusivity clause was unenforceable.[7] Pl. exhibit 115. Over the course of several months PVC attempted to negotiate with Weis to terminate its lease but Weis refused. Evidence was presented that would allow the jury to conclude that Weis' refusal was part of a scheme to stifle competition in the area. See for example, N.T. Oct. 11, 2000 at pp. 51, 81-83. Evidence was also presented that would allow the jury to conclude that Weis knew or should have known that such action would adversely affect PVC and the other tenants at the plaza. See N.T. Oct. 11, 2000 at pp. 10-14, 18-19, 96-98, 119-20; N.T. Oct. 12, 2000 at pp. 25-27; N.T. Oct. 12, 2000 at pp. 143-44; N.T. Oct. 17, 2000 at p. 220. The jury could have concluded from this evidence that but for this improper motive Weis would have either terminated its lease or subleased the space thus allowing for Giant to enter the plaza, and that acting in the manner it did caused PVC to suffer harm.

Weis also argues that section 766 requires that the actor's conduct be directed at the third party, in this case Giant, in order for a plaintiff to recover. There is no requirement in section 766 or in the comments to it that an actor's conduct must be directed at the third party. The plain language of section 766 only requires that an actor's intentional and improper conduct "induc[e] or otherwise

7. There was no evidence presented on whether Giant or PVC included this language in the lease, so the jury may have presumed it to be included at Giant's insistence leaving PVC no option on whether to include it in the lease.

caus[e] the third person not to perform the contract." Restatement (Second) of Torts §766 (1979). Although the cases that have relied on section 766 have typically involved conduct directed at the third party there is no requirement in them or in the section itself that such directed conduct is required.

Comment h in part states "[t]he phrase 'otherwise causing' refers to the situations in which A leaves B no choice." Restatement (Second) of Torts §766, comment h (1979). The court can imagine a variety of situations where an actor's conduct, not directed at the third party, would either leave that third party no choice or cause that third party not to perform the contract. Further, the comments make clear that "[t]he essential thing is the intent to cause the result," *id.,* that "[t]here is no technical requirement as to the kind of conduct that may result in interference with the third party's performance of the contract." *Id.* at comment k. Reading section 766 and the comments to it as a whole the court can find no requirement that the conduct be directed *at* the third party.

Additionally, although the case law cited by Weis deals with situations in which the actor directs his conduct at the third party, nowhere in that case law is there a stated requirement that such directed action is a prerequisite to recovery under section 766. The court has been unable to locate a case in which an actor's conduct was directed at someone other than the third party, this does not mean however that such conduct cannot be the basis for recovery under section 766, it means only that no court has yet considered the question in a published opinion.

Even if section 766 does require such directed action PVC has stated a claim under section 766A. This section recognizes a cause of action for interference with contractual relations where the actor's conduct prevents the other from performing its contract with a third party. Section 766A reads:

"One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him." Restatement (Second) of Torts §766A (1979).

Weis correctly notes that our Supreme Court has not yet adopted section 766A[8] and a search has not revealed any Pennsylvania case that has expressly approved of section 766A. The federal courts in applying Pennsylvania law have fluctuated from applying section 766A to hesitating to predict if our Supreme Court would adopt it. See *Peoples Mortgage Co. Inc. v. Federal Nat. Mortg. Ass'n,* 856 F. Supp. 910, 933 (E.D. Pa. 1994) ("we would hesitate to predict that the Pennsylvania Supreme Court would adopt section 766A"); *Batoff v. State Farm Insurance Co.,* 1992 WL 59142 at *5, 1992 U.S. Dist. Lexis 3501 at *14-*15 (E.D. Pa. 1992) (noting no Pennsylvania courts have interpreted or applied section 766A; applying and finding no section 766A liability); *Eisele v. Holloway (In re Eisele),* 125 B.R. 922, 928-32 (Bankr.

---

8. As indicated above our courts have adopted or quoted with approval sections 766 and 766B of the Restatement (Second).

W.D. Pa. 1991) (applying and finding liability under section 766A).

It is without question that a state court is not bound by a federal court's interpretation of that state's laws. See *Frey by and through Frey v. Smith by and through Smith,* 454 Pa. Super. 242, 685 A.2d 169 (1996); *Commonwealth v. Parker,* 422 Pa. Super. 393, 619 A.2d 735 (1993). Logically then this court is not bound by the decisions of the various federal courts which indicate that Pennsylvania would not adopt section 766A in an appropriate case. The courts of this Commonwealth have traditionally applied the Restatement (Second) of Torts in reviewing claims of intentional interference with contractual relations. See *Adler,* 482 Pa. 416, 393 A.2d 1175; *Triffin,* 426 Pa. Super. 57, 626 A.2d 571. See also, *Taylor v. Albert Einstein Medical Center,* 562 Pa. 176, 754 A.2d 650 (2000) (relying on section of the Restatement (Second) of Torts which has never been formally adopted to establish the elements of a cause of action for intentional infliction of emotional distress). Further, there is nothing in the case law to suggest that, if faced with an appropriate case, our Supreme Court would reject section 766A as an accurate statement of the law.

In *Price v. Sorrell,* 784 P.2d 614 (Wyo. 1989), quoted in several federal decisions deciding that our Supreme Court would not adopt section 766A, see *Gemini Physical Therapy v. State Farm Mutual Automobile Insurance Co.,* 40 F.3d 63, 66 (3d Cir. 1994); *Windsor Secur. Inc. v. Hartford Life Insurance Co.,* 986 F.2d 655, 661 n.10 (3d Cir. 1993), the Supreme Court of Wyoming directly faced the application of section 766A of the Restatement (Second). In *Price* the defendant's interference made the

plaintiff's performance of a contract more costly. Although the Supreme Court of Wyoming had previously adopted sections 766 and 766B of the Restatement, it refused to adopt section 766A. It reasoned that causing performance of a contract to be more costly "as an element of proof is too speculative and subject to abuse to provide a meaningful basis for a cause of action." *Price,* 784 P.2d at 616.

However, this does not mean that section 766A in its entirety is flawed. Section 766A imposes liability on an actor if his conduct either prevents another from performing his contract with a third party or by making that performance more costly. The former appears to be little more that a restating of section 766 that is intended to make clear that an actor's conduct need not be directed at a third party. Further, section 766A is the logical extension of the existing tort and this court can find no reason in current case law that our Superior or Supreme Court would reject this narrow application of section 766A. It seems irrational to recognize a cause of action for a party's conduct directed at a third party designed to prevent that third party from performing a contract with another and not recognize a similar cause of action for that other party where the actor's conduct is instead directed at the other to prevent them from performing. In either case an actor's improper conduct is preventing the performance of a valid contract to which it is not a party.

For example, in the instant case Giant could have initiated an action under section 766 against Weis for action directed at PVC that prevented the PVC-Giant lease from being performed. If Weis' interpretation of the Restatement were accurate it would leave PVC without any

means to recover its losses from Weis resulting from the same conduct. Under this interpretation Giant would be able to be made whole but PVC would not. This result would not only be illogical but also allow Weis, and other actors, to be unjustly enriched by their improper conduct. Further, there would be no deterrent to actors since they could engage in improper conduct without fear of paying for their acts. Such as Mr. Weis' statement that he could not allow Mr. Zamias to bring Giant into the plaza and the inference it raises that he intended this action to limit his competition.

Either under section 766, as this court interprets it, or under section 766A, as applied by this court, PVC stated a cause of action against Weis. It was for the jury to determine if the facts satisfied the requirements of the tort. The court's jury instruction explained the four elements of the tort, the factors to apply in determining if Weis' conduct was improper and that the jury was to determine if Weis acted in good faith in asserting the exclusivity provision which would make its conduct proper under section 773. N.T. Oct. 18, 2000 at p. 205. The jury was also instructed that one who causes a loss of business to another by engaging in a business in good faith is not liable to the other for those losses. *Id.* Indeed imposing liability under those circumstances would counter to the very nature of our system of free competition and open markets. In this case, there was sufficient evidence presented at trial to allow the jury to find, as they did, that Weis improperly and intentionally interfered with the PVC Giant lease and that Weis did not engage in business in good faith so as to exempt them from liabil-

ity. Therefore, the jury could properly find for PVC on the tort claim and award damages.

## IV. DAMAGES AND THE JURY'S VERDICT

Finally, Weis claims the damages awarded by the jury are either not supported by the evidence or were excessive under the facts of this case. Weis also raises the issue that the verdict was flawed and should not be accepted since the jury failed to enter an answer to special interrogatory 3 which read "[i]f you answered yes to questions 1 [did Weis breach the lease] and 1A [did this breach cause damage to PVC], state the amount of damages incurred by the plaintiff, PVC Realty." N.T. Oct. 18, 2000 at p. 219.

### A. *Are the Compensatory Damages Supported by the Evidence*

It is without question that in this Commonwealth the trial court has the authority to order a remittitur of an award of excessive damages. *Ready v. Motor Sport Inc.,* 201 Pa. Super. 528, 193 A.2d 766 (1963). See also, *Sprague v. Walter,* 441 Pa. Super. 1, 656 A.2d 890 (1995); *Daley v. John Wanamaker Inc.,* 317 Pa. Super. 348, 464 A.2d 355 (1983). However, the trial court should not interfere with functions of the jury and undertake to determine facts, which is exclusively the province of the jury. When it is apparent that the jury has returned a verdict excessive in amount and clearly beyond what the evidence warrants, the trial court should set aside or reduce the verdict. *Jones v. Stiffler,* 137 Pa. Super. 133, 8 A.2d 455 (1939). Conversely, if the verdict is supported

by evidence, it must be permitted to stand where there is nothing to suggest that the jury was in any way guided by partiality, prejudice, mistake or corruption. *Stoughton v. Kinzey,* 299 Pa. Super. 499, 445 A.2d 1240 (1982). Therefore, "it is the duty of the court to enforce the jury's verdict unless the circumstances cry out for judicial interference." *Daley,* 317 Pa. Super. at 352, 464 A.2d at 358 (citing *Prather v. H-K Corp.,* 282 Pa. Super. 556, 423 A.2d 385 (1980)).

Even a substantial verdict, if supported by the evidence, must be permitted to stand and will not be set aside when there is nothing to suggest that the jury was in any way guided by partiality, prejudice, mistake or corruption. See *Prather, supra; Dollison v. Baltimore and Ohio Railroad Company,* 446 Pa. 96, 284 A.2d 704 (1971); *Carminati v. Philadelphia Transportation Company,* 405 Pa. 500, 176 A.2d 440 (1962). Here, the evidence concerning the actions of Weis and the damages suffered by PVC as both lost profits and diminution in resale value of the plaza was widely divergent. Notably, Weis chose not to present any testimony to rebut the damages claimed by PVC as established by a number of PVC witnesses. Apparently the jury found PVC's evidence more convincing than either Weis' attempt to rebut that evidence on cross-examination or what little evidence Weis' witnesses presented. Absent any figures on damages from Weis the jury used its judgment to fashion an award from the evidence presented by PVC. The evidence presented by PVC supports the jury award of $6.5 million in compensatory damages and so the award will not be disturbed.

## B. *Were the Punitive Damages Excessive*

Pennsylvania subscribes to the Restatement (Second) of Torts approach to punitive damages. *Daley,* 317 Pa. Super. at 355, 464 A.2d at 358. Specifically in *Feld v. Merriam,* 506 Pa. 383, 485 A.2d 742 (1984), our Supreme Court adopted section 908(2) of the Restatement (Second) of Torts. Section 908(2) states:

"(2) Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant." Restatement (Second) of Torts §908(2) (1979). See also, *Kirkbride v. Lisbon Contractors Inc.,* 521 Pa. 97, 102, 555 A.2d 800, 803 (1989) (standard under which punitive damages are measured requires analysis of the following factors: (1) the character of the act; (2) the nature and extent of the harm; and (3) the wealth of the defendant).

It is for the jury to weigh these factors in arriving at an appropriate punitive damage award. *Id.*

Comment e to section 908 explains additional factors a jury may consider when deciding whether to award punitive damages and the amount. Comment e reads in part:

"Amount of damages. In determining the amount of punitive damages, as well as in deciding whether they shall be given at all, the trier of fact can properly con-

sider not merely the act itself but all the circumstances including the motives of the wrongdoer, the relations between the parties, and the provocation or want of provocation for the act (see section 921)." Restatement (Second) of Torts §908 comment e (1979). See also, *Daley,* 317 Pa. Super. at 355, 464 A.2d at 358.

Clearly under the Restatement (Second) approach, as applied in this Commonwealth, the decision of whether to award punitive damages and the amount to be awarded are within the discretion of the fact-finder. *Id.* See also, *Focht v. Rabada,* 217 Pa. Super. 35, 268 A.2d 157 (1970); Restatement (Second) of Torts §908(2) (1979).

The excessiveness of punitive damages in a case in which they are allowable may be grounds for reversal, for a new trial, or for a remittitur under the usual rules by which the courts control the jury's award of compensatory damages. *Sprague,* 441 Pa. Super. at 71, 656 A.2d at 925. See also, Restatement (Second) of Torts §908, comment d (function of jury) (1979). However, a trial judge may not declare a punitive damages verdict to be excessive simply because he or she might have awarded a lesser amount. *Id.*

"An essential fact needed to support a claim for punitive damages is that the defendant's conduct must have been outrageous." *Smith v. Brown,* 283 Pa. Super. 116, 120, 423 A.2d 743, 745 (1980). Outrageous conduct has been defined as an act "done with a bad motive or with a reckless indifference to the interests of others." *Focht,* 217 Pa. Super. 35, 38, 268 A.2d 157, 159. See also, *Temporaries Inc.,* 325 Pa. Super. at 114, 472 A.2d at 673. As noted in *Temporaries Inc.:*

"Reckless indifference to the interests of others, or as it is sometimes referred to, wanton misconduct, means that the actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow." *Temporaries Inc.,* 325 Pa. Super. at 114, 472 A.2d at 673 (quoting *Smith v. Brown,* 283 Pa. Super. 116, 120, 423 A.2d 743, 745 (1980)). (internal quotation marks omitted)

There is sufficient evidence to sustain the finding of the jury that Weis' conduct was outrageous in a legal sense. The jury concluded that Weis acted with a bad motive from the evidence and argument of PVC that there was an ongoing scheme to engage in destructive anti-competitive acts. Additionally, the jury may have concluded that Weis acted with reckless indifference to the interests of others by engaging in conduct that, given the unique interrelationship of shopping mall tenants, they knew or should have known would cause harm not only to PVC but to the other tenants of the plaza.

Weis contends that even if punitive damages were proper the amount is excessive or out of proportion to the compensatory damages. Under Pennsylvania law, punitive damages need bear no proportional relationship to the compensatory damages awarded in a particular case. *Kirkbride,* 521 Pa. at 103-104, 555 A.2d at 803. Rather, a reasonable relationship must exist between the amount of the punitive damage award and the twin goals of punishment and deterrence, the character of the tortious act, the nature and extent of the harm suffered by the plaintiff, and the wealth of the defendant. *Id.* at 104,

555 A.2d at 803-804. Our Supreme Court has ruled that a mathematical proportionality requirement between punitive and compensatory damages would actually defeat the purpose of punitive damages, which is to punish tort-feasors for outrageous conduct and deter them and others from similar conduct. *Id.* at 103, 555 A.2d at 803.

"If [the Supreme Court] were to adopt the [theory that punitive damages must be proportional to compensatory damages], outrageous conduct which only by luck results in nominal damages, would not be deterred and the sole purpose of a punitive damage award would be frustrated. If the resulting punishment is relatively small when compared to the potential reward . . . , it might then be feasible for a tort-feasor to attempt the same outrageous conduct a second time. If the amount of punitive damages must bear a reasonable relationship to the injury suffered, then those damages probably would not serve as a deterrent. It becomes clear that requiring punitive damages to be reasonably related to compensatory damages would not only usurp the jury's function of weighing the factors set forth in section 908 of the Restatement (Second) of Torts, but would also prohibit victims of malicious conduct, who fortuitously were not harmed, from deterring future attacks." *Id.* at 103-104, 555 A.2d at 803.

The courts of this Commonwealth are fully empowered to remit punitive damages whenever the award is shocking to the court's sense of justice. *Kirkbride,* 521 Pa. at 103-104, 555 A.2d at 803-804. In *Kirkbride,* our Supreme Court indicated that the true test is to determine whether the award of punitive damages shocks the court's sense of justice. Courts are to consider the fol-

lowing factors in determining the propriety and/or lack of excessiveness of the award: (1) whether the amount of punitive damages award bears a reasonable relationship to the character of the act; (2) the nature of the plaintiff's harm; (3) the extent of the harm suffered; (4) the wealth of the tort-feasor; (5) the deterrent effect of the award. *Id.,* 521 Pa. at 103-104, 555 A.2d at 803-804. Applying this analysis to this case the award of $15 million in punitive damages does not so shock the court's sense of justice to require a remittitur.

The jury's award of punitive damages was 2.31 times its award for compensatory damages. This court cannot say that such an award is improper by law since courts have upheld punitive damage awards proportionally greater than this. See *e.g., TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (plurality affirmance of punitive damages 526.3 times larger than compensatory damages); *Pacific Mutual Life Insurance Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) (upholding punitive damage award more than 200 times larger than compensatory award); *Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265 (3d Cir. 1979) (punitive damages six times that of compensatory damages held not excessive). Accordingly, the award of punitive damages does was the prerogative of the jury and will only be disturbed for the reasons noted above. Since none of those reasons are present this court will not alter the considered opinion of the jury.

## C. *The Verdict*

Weis' final contention is that by leaving special interrogatory 3 blank on the verdict slip the jury intended to award no damages for Weis' breach of contract. It is basic law in this Commonwealth that strict form is not required in verdicts. *Palmer v. Moses,* 458 Pa. 535, 327 A.2d 80 (1974). What is required is for the jury's intention to be free of ambiguity and clearly understood. *Id.* In *Parks v. Bishop,* 296 Pa. 91, 145 A. 718 (1929), our Supreme Court stated "[i]n *Friedly v. Scheetz,* 9 S. & R. 155, 165, this court very early said: 'Strict form is not now required in verdicts; it is only to be understood what the intention was, agreeable to which the verdict may afterwards be moulded [sic] into form.' " *Id.* at 93, 145 A. at 719.

It is only where the verdict is so uncertain that it cannot be clearly ascertained what the jury decided on the issues presented that a court is justified in refusing to accept it. See *Palmer,* 458 Pa. at 542, 327 A.2d at 84; *Anstine v. Penna. R.R. Co.,* 342 Pa. 423, 20 A.2d 774 (1941); *Eastly v. Glenn,* 313 Pa. 130, 169 A. 433 (1933); *Schmertz v. Shreeve,* 62 Pa. 457 (1869). As noted by Mr. Justice Eagen, speaking for our Supreme Court, in *Hornak v. Pittsburgh Railways Company,* 433 Pa. 169, 249 A.2d 312 (1969):

"It is true that a trial judge has wide discretion in directing further deliberations by a jury so that the jury might correct matters of informality and uncertainty. . . . But by the same token, every reasonably possible intendment is to be made in favor of the findings of a jury, and an inconsistency may justifiably be declared to exist only

if there is no reasonable theory or conclusion to support the jury's verdict." *Id.* at 175, 249 A.2d at 315. (citations omitted)

Additionally, in our Commonwealth it is a general principle of law that irreconcilable inconsistencies are not permissible in jury verdicts, that consistency will be presumed if possible, *Beyrand v. Kelly,* 434 Pa. 326, 329, 253 A.2d 269 (1969), and that a trial court must mold the verdict of a jury when that is possible rather than ordering a new trial. *Palmer v. Moses,* 458 Pa. 535, 327 A.2d 80 (1974). See also, *Ferrick Excavating and Grading Co. v. Senger Trucking Co.,* 506 Pa. 181, 484 A.2d 744 (1984).

Here the jury was presented a verdict slip[9] that consisted of four special interrogatories. See N.T. Oct. 18, 2000 at pp. 219-20; verdict slip. The first two were in two parts with question 1 asking the jury if Weis breached its contract and question 1A if so had PVC suffered damage as a result of the breach. Question 2 addressed whether Weis had intentionally interfered with the PVC-Giant lease and question 2A asked if so had damage resulted to PVC as a result. Question 3 required the jury to state the damages, if any, that PVC suffered as a result of Weis' breach of contract. Question 4 asked the jury to set the amount, if any, of those damages PVC suffered as a result of Weis' interference with the Giant lease separated into compensatory and punitive damages.

The verdict slip also contained the following "*Note:* Please note that the damages you awarded in answer to question 3 may not be duplicative or include any dam-

---

9. A copy of the verdict slip is attached to this opinion.

ages awarded in answer to question 4." Verdict slip at p. 2. The verdict slip was the result of consultation with counsel for both parties and represented a compromise between what each believed the slip should contain. The note was included specifically at the request of counsel for Weis.

The jury answered questions 1A, 1B, 2A, 2B in the affirmative, left question 3 blank and in question 4 entered an amount of $6.5 million for damages and $15 million for punitive damages. Upon reviewing the verdict slip with the jury the following exchange occurred:

"The Court: And all right, and question 3, if you answered yes to question 1 and 1A, state the amount of damages incurred by the plaintiff, PVC Realty.

"Bernice Ritter [jury foreperson]: Your honor, we left that blank because we were following the note at the bottom of the page there." N.T. Oct. 18, 2000 at pp. 219-20.

Clearly the jury intended to award damages to PVC for the breach of contract claim since they answered questions 1 and 1A in the affirmative. Based on the explanation given by Ms. Ritter the court concluded that the jury believed the note to mean that they should only complete either question 3 or question 4 not both. After the verdict was entered no party asked to have the jury redo the verdict slip in order to separate the award.

The court finds that the jury's intention is free of ambiguity and clearly understood as to the liability of Weis on the issues of breach of contract and the tort claim. As noted above, our Supreme Court indicated that "it is only to be understood what the intention was, agreeable to which the verdict may afterwards be moulded [sic] into form." *Hornak,* 433 Pa. at 93, 145 A. at 719. The jury's

intention in this case is clear; all that remains to be accomplished is to mold the award of damages in a manner that best expresses their intention. Given the court's disposition of the rest of Weis' motion it is not necessary at this time to mold the verdict as it currently accurately expresses the jury's intent.

Accordingly the following order is entered:

## ORDER

Now, December 19, 2000, upon consideration of defendant's motion for post-trial relief it is hereby ordered and decreed that defendant's motion is denied.

---

## PLEASE READ ALL QUESTIONS AND INSTRUCTIONS BEFORE FILLING IN ANY ANSWERS

Question 1

Do you find that defendant, Weis Markets, breached its contract with plaintiff, PVC Realty?

YES _X_ NO ___

Question 1A

Was the breach of contract you found in question 1, a substantial factor in causing damages to the plaintiff?

YES _X_ NO ___

Question 2

Do you find that defendant, Weis Markets, intentionally interfered with plaintiff's, PVC Realty, contract with Giant Foods?

YES _X_ NO ___

Question 2A

Was the intentional interference you found in question 2, a substantial factor in causing damage to the plaintiff?

YES _X_ NO ___

(If you answered questions 1 and 1A or 2 and 2A "yes", go to question 3 and/or 4. If you answered both questions 1 and 2 or questions 1A and 2A "no", then plaintiff, PVC Realty cannot recover and you should return to the courtroom.)

Question 3

If you answered "yes" to questions 1 and 1A, state the amount of damages incurred by the plaintiff, PVC Realty.

$_____

Question 4

If you answered "yes" to questions 2 and 2A, state amount of damages and punitive damages, if any.

| | |
|---|---|
| Damages | $6,500,000 |
| Punitive damages (if any) | $15,000,000 |
| Total | $21,500,000 |

Note: Please note that the damages you awarded in answer to question 3 may not be duplicative or include any damages awarded in answer to question 4.

October 18, 2000

/s/Bernice Ritter